J. N. JOSLIN v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COM-PANY ET AL., Appellants.—3 S. W. (2d) 352.

Division One, March 3, 1928.

*Morrison, Nugent, Wylder & Berger* for appellants.

*Fyke, Hume & Hall* and *E. M. Harber* for respondent.

SEDDON, C.—This is an action wherein plaintiff, a locomotive engineer, seeks to recover compensatory and punitive damages because of certain alleged false, malicious and wrongful charges claimed to have been made by defendants to plaintiff's employer, the Missouri, Kansas & Texas Railway Company, which charges plaintiff alleges caused, and resulted in, his discharge and dismissal from the service and employment of his said employer. The defendants herein are the Chicago, Milwaukee & St. Paul Railway Company, a corporation, and J. P. Stewart and J. F. Anderson, who are, respectively, the general yardmaster and the superintendent of the corporate defendant at Kansas City, Missouri.

The petition, as originally filed, was in two counts, but, on the trial of the action, plaintiff voluntarily dismissed the second count of the petition and the action was submitted upon the first count alone. The first count of the petition alleges the employment of plaintiff by the Missouri, Kansas & Texas Railway Company as a locomotive engineer, and that, in the course of his duties as such engineer, it was required of him, and was necessary, that he run and operate the locomotive engine in his charge over and along the tracks of defendant Chicago, Milwaukee & St. Paul Railway Company, and that plaintiff had the right to pass over and along said tracks; and that defendant Stewart was the yardmaster, and defendant Anderson was the superintendent, of the defendant railway company. The gravamen of plaintiff's cause of action is thus alleged in the first count of the petition:

"That on or about September 26, 1923, the said defendants wrongfully and wickedly intending to injure plaintiff and to cause him to be

discharged by his said employer, without cause, reason or justification falsely, wrongfully and maliciously notified plaintiff's employer that plaintiff as such engineer had wrongfully blown off the engine of which he was engineer in yards at Kansas City, Missouri, causing great injury to defendant Stewart's automobile there being, and had at said time wrongfully assaulted and beat, or permitted his fireman to so wrongfully assault and beat, said Stewart, demanding the discharge of plaintiff, and threatened said Missouri, Kansas & Texas Railway Company, plaintiff's employer, as aforesaid, that unless it did at once discharge plaintiff from its service, the right then and theretofore enjoyed by said Missouri, Kansas & Texas Railway Company, its predecessors and all other railroads operating in Kansas City, Missouri, of moving its engines and cars over the tracks of the defendant in Kansas City, Missouri, would be denied and prevented, which said right was essential and necessary to the end that said Missouri, Kansas & Texas Railway Company, plaintiff's employer, could do or carry on its business as public carrier, by reason of which said false statements, wrongful, unlawful and malicious threats, acts and conduct of the defendants, and not for any good or sufficient reason, plaintiff was at the instigation of defendants discharged and prohibited by his employer from again operating an engine or cars in Kansas City, Missouri; that but for the wrongful, unlawful and malicious acts of defendants plaintiff would not have been discharged, but would have continued in the service of his employer, in whose service, by reason of his long and faithful service, he had earned and was entitled to certain seniority rights and privileges as an employee of his employer, which rights and privileges were of great value, and which, by reason of the wrongful and malicious acts of the defendants in so causing his discharge, plaintiff has lost.

"Plaintiff says that he is now and for years last past has been a resident of Kansas City, Missouri, where his home and family are located. That on account of plaintiff's long service as a railroad employee and engineer he is not qualified and is unable to procure employment in any other line of work; that on account of his discharge as aforesaid he is unable to procure employment as a locomotive engineer or other employment as a railroad employee. Plaintiff avers that at the time he was discharged by the railroad and prohibited from operating an engine as aforesaid, he was earning at the rate of $6.89 per day, or at the rate of over two hundred dollars per month. That since his discharge as aforesaid he has not been able to earn anything and will in the future be unable to earn a living for himself and family.

"Plaintiff says that the acts, threats and conduct of defendants aforesaid in causing his discharge were done by defendants wrong-

fully, unlawfully and maliciously for the purpose of injuring plaintiff and without any just cause."

The petition prays judgment for $10,000 actual damages, and $25,000 exemplary, or punitive, damages.

The joint answer of defendants denies generally all of the allegations of the petition; avers that, on the date mentioned in the petition, there was in force and effect a rule common to all railroads operating engines and trains over the tracks of the Kansas City Terminal Railway Company in its yards in Kansas City, Missouri, making it the duty of any employee of said companies to report to his superior officer any violation of the rules promulgated by said companies relative to the conduct of such employees, or the manner of operating engines and trains in said yards; that there was another rule common to all said railroad companies that no employee in charge of, or operating, an engine in the yard of said Terminal Railway Company should "blow" the engine while in said yards, and if any engineer violated said rule, it became the duty of the yardmaster to report the violation of the rule to his superior officer; that it was, and had been for many years, the practice and custom for the various railroad companies, whose lines extended into the yards of said Terminal Railway Company, to use the tracks of each other company while operating in said yards, subject to the regulations that, if any employee operating an engine or train of cars over the tracks of a company other than the tracks of his employer violated the rule against the "blowing" of his engine, or entered into any quarrel, disagreement or personal encounter with an employee or employees of the company over whose tracks he was operating said engine or train, then, on notice to his employer, he should be prevented from operating any engine or train over such tracks; that, on the day mentioned in the petition, plaintiff was operating an engine over the tracks of defendant railway company in the yards of said Terminal Railway Company, and while so operating said engine, plaintiff did "blow" said engine in violation of the aforesaid rule; that defendant Stewart, as was his duty, protested to plaintiff for so doing, whereupon plaintiff and his fireman became angry, and threatened to, and did, assault defendant Stewart; that thereupon defendant Stewart reported the facts to defendant Anderson, his superior officer, who in turn, pursuant to the custom and practice in such matters, requested plaintiff's employer to prevent plaintiff from operating an engine over the tracks of defendant railway company until the matter of said complaint and disagreement could be investigated by plaintiff's employer, and until it could be fully determined whether the complaint against plaintiff's conduct was true or untrue; that thereafter plaintiff's employer did investigate said complaint, and found that plaintiff did "blow" his engine in said yards and did enter into a quarrel

and personal encounter with defendant Stewart, and that defendant's complaint and request that plaintiff be prevented from operating an engine over the tracks of defendant railway company in said yards was fully justified; and defendants furthermore specifically deny "that they, or any of them, at any time or place caused, or tried to cause, plaintiff to be discharged from the service of his employer, and if plaintiff was discharged, as alleged, by his employer, it was the free and voluntary act of his said employer, wholly independent of any act or acts or representations of these defendants."

The reply denies generally the allegations of the answer.

The cause was submitted to a jury, and nine of the jurors returned a verdict in favor of defendant Anderson, and in favor of plaintiff and against the other defendants, Chicago, Milwaukee & St. Paul Railway Company and Stewart, assessing plaintiff's actual damages at $2500, and exemplary or punitive damages at $6,366, and judgment was entered in accordance with such verdict. After ineffectual motions for a new trial and in arrest of judgment, the defendants, J. P. Stewart and Chicago, Milwaukee & St. Paul Railway Company, were allowed an appeal to this court. Plaintiff took no steps to appeal from the verdict and judgment entered in favor of defendant J. F. Anderson.

The evidence on behalf of plaintiff tends to show that he had been employed by the Missouri, Kansas & Texas Railway Company as a locomotive engineer for about seven years prior to September 26, 1923, and that he had been employed by the same company as a locomotive fireman for some years prior to his employment as an engineer. It appears from the evidence that, in the course of his duties and in the interchange of business between plaintiff's employer and other railroad companies, plaintiff operated a switching engine in the yards of the Kansas City Terminal Railway Company and over the tracks of other railroad companies, including the tracks of the defendant Chicago, Milwaukee & St. Paul Railway Company. About five o'clock in the afternoon of September 26, 1923, plaintiff and the fireman of his engine, one York, together with a switching crew, had been operating a switching engine upon the tracks of the defendant railway company near its freight depot in the Liberty Street yard in Kansas City, and while the engine operated by plaintiff was standing upon a track of the Santa Fe Railroad Company leading from defendant's tracks, an altercation occurred between plaintiff, Joslin, the fireman, York, and defendant Stewart, general yardmaster of the defendant railway company.

Plaintiff, in testifying as a witness in his own behalf, gave this version of the altercation: "A strange man—a stranger—climbed upon the engine, and I was standing over on the fireman's side, and when I heard the commotion, his climbing up, I turned around and

was facing the man; he says to me, 'I want to thank you two men for the good job you done, blowing the engine off and ruining my automobile.' The fireman says, 'We haven't blowed the engine off.' He says, 'I know a damned sight better, you have blowed this engine off and ruined my automobile.' I says, 'I am the engineer on this engine; I'm in a position to know; we blowed this engine off at the M. K. & T. yards; before commencing our work we did that, and we haven't blowed her off since then.' He says, 'Has there been any other engine working in here?' I says, 'I don't know; I don't know what engines have been in here. I have noticed two or three engines not far away,' and I think the fireman said something about a Wabash engine that had been working on the east side of the Milwaukee depot, not far from where we worked. Then he says, 'I am going up to the Sante Fe office. . . . I am going down and check you up, and if I find this Katy engine came in, in the last hour,' with his finger just like that under my nose, he says, 'I am going to make it damned hot for you.' I says, 'We are men, we are entitled to be talked to respectable.' I climbed upon my seat box and then he directed his remarks to the fireman. He commenced on him in the same line, of course, and directly called him a liar. . . . I couldn't catch everything he said to the fireman. He accused the fireman of blowing the engine off, but held me as being responsible, and the fireman did call him a damned liar. I think he said damned liar. He (the fireman) stepped down off his seat and with his left hand picked up the monkey wrench that was resting in the receptacle; this stranger started toward the gangway, and the fireman placed the wrench back from where he had taken it, and followed right around after the man, and he jumped off on the ground; he was still raving and halloed back and asked me my name. I told him Joe Joslin. He didn't seem to catch what I said. I paid no further attention to him. He said something about getting our jobs, and started to walking back in the opposite direction from where the engine was.''

The fireman, York, testifying as a witness on plaintiff's behalf, thus related the occurrence: ''Well, the first I noticed Mr. Stewart being on the engine, he crawled up in the deck of the engine; he never told me who he was; he says to my engineer, looked right up in his face, I hadn't got upon my seat yet, he says, 'I will have to thank you and your fireman for blowing out your engine on my automobile and ruining it.' My engineer, Mr. Joslin, says, 'My friend, you are mistaken, we haven't blowed out any engine; we blowed out our engine in Glen Park yards.' and Mr. Stewart says, 'Don't lie to me, go back and look at my car for yourself.' Mr. Joslin says, 'We didn't do it.' We didn't think he was a railroad man; the man appeared to be intoxicated. Mr. Joslin argued with him on the deck of the engine, and he left the deck of the engine and came over to where I

was. Mr. Joslin crawled upon the seat box. Then Mr. Stewart turned to me and says, 'Fireman, you are the man that blowed out the engine on my automobile, but I hold the engineer responsible.' I says, 'Man, you are mistaken, we haven't blowed out the engine;' he says, 'You are a damned liar;' he was coming toward me, and I slid off the seat box and picked up a monkey wrench, and I followed him out to the deck; I followed him over, and just then he jumped off on the ground, and when he struck the ground, jumped off, he looked up and says, 'You don't know who I am; I am an official of the company; I will get you fellows fired.' He says to Mr. Joslin, 'What is your name?' He says 'Joe Joslin.' He says to me, 'What is your name?' I says, 'You can get my name from the officials.' I heard him ask Mr. Downs (one of the switching crew) who we were, and Mr. Downs says, 'I have only been here a short time; I know their faces, but I don't know their names.'

Switchman Downs testified: "I noticed Mr. Stewart up in the cab; I stood there and listened; I heard him ask the fireman, 'Did you blow this engine out?' And the fireman says, 'No, sir, I didn't;' he says, 'You are a damned liar;' he says, 'You fellows will suffer for this.' And York (fireman) got off the seat box, and as he did he put his hand over on the can rack, that is above the fire box door where they carry their oil cans, and Mr. Stewart instead of taking hold this way, jumped out of the gang-way, and turned around and asked the engineer his name; the oil burner makes a noise, what he said, it seemed as though he said, 'Joe Joslin;' and he turned around and asked the fireman his name, and the fireman said, 'Go to the company officials and ask them my name.' And he (Stewart) says. 'You fellows will pay for this,' and he walked on back. Q. As he got off the engine what happened with respect to his (Stewart) striking anything? A. He looked back; he hit a bolt, it is there to-day, four inches long on the engineer's side, that holds the safety appliance onto the cab; as he came out of the gangway, he struck his head against that bolt and turned his hat half-way around; I says, 'Who did that?' . . . And then the fireman asked me who that man was, and I says, 'I think it is the Milwaukee yardmaster at Coburg;' and we got ready and left then. and he asked me if they blowed the engine out, and I told him no, but the engine was working water, it was all over my back; . . . the engine naturally worked water, it was all over my back; the wind was in the southwest to blow it on my back; I had black spots all over my shirt. . . . Q. And this engine was forcing and throwing water out through the smoke-stack, got all over you and all over Lane (foreman of the switching crew), and the allegation now is, they didn't blow the engine out; the water could have gotten on the car (automobile) by being blown out through the smoke-stack? A. Yes, sir; in the direction the wind was com-

ing. . . . Q. You said the engine was as close as three or four car-lengths (from the Milwaukee Railway freight depot)? A. Yes, sir. Q. When did it commence to foam? A. When we commenced to make the switch. Commenced right there. Q. You didn't examine Stewart's car did you? A. I didn't know it was there."

Witness Jackson, who said that he was a "special officer" in the employ of the Missouri, Kansas & Texas Railway Company, testified: "Well, Mr. Stewart came rushing over about when I came on duty. I seen he was awfully mad. I said, 'What is the matter?' He says, 'Them . . . men over there—on our engine—I am going to see that them men stay off Milwaukee property and make them lose their jobs.' I says, 'Mr. Stewart, maybe these men have families, and their wives may starve.' He said, 'I don't give a damn. I am going to get their jobs and they have to stay off of Milwaukee property.' I says, 'It seems you have been fighting.' 'No,' he says, 'they ruined my automobile and that fireman struck at me with his monkey wrench and hit me on the arm, it is nearly broke.' I says, 'Pull off your coat; I have some liniment here I will rub on your arm and it will give you relief until you can get to a doctor.' He says, 'I am going to the hospital; I don't want you to relieve it; the Katy has to pay my doctor bill and paint my machine over.' He said, 'I want to talk to Waddell.' I said, 'You can get him if you know his number.' I walked out of the house to these fellows, Mr. Joslin and Mr. York, engineer and fireman—I walked over there; they seemed to be coming out from the yard; quick as they come, I got on the engine and said to the fireman, 'What was you fellows doing to Stewart?' He said, 'He got up here and was fussing about his car.' I said to the fireman, 'Did you strike him with the monkey wrench?' He said, 'No, Jack, I didn't.' I says, 'Why he came out rubbing his arm; I wanted to put some liniment on it, but he wouldn't let me.' The fireman said, 'He got up on the engine, I picked up a monkey wrench and laid it out of the way to keep him from getting hold of it.' So I laughed a little, and says, 'You fellows picked a funny place, on Liberty Street, to blow your boiler out. Looks like you wouldn't try to blow the boiler out.' He said, 'We never thought of blowing the boiler out there.' It was right there on Liberty Street where there was so much passing, you know. . . . Q. What was it Stewart said, if anything, about his having got up on the engine? A. Why, he got up on the engine; Stewart said, 'I got up on the engine to talk with them fellows about it—they tried to kill me.' He was foaming at the mouth, he was so mad, good and mad. I watched him, afraid he would knock me down. He got up to the 'phone and asked our operator Waddell's number, but I got up and went out. Q. You heard him go and call for Waddell? A. Yes. Q. Did he remain there sometime after that? A. I never noticed, I went off.

260

. . . Q. How many times, if more than once, and with an oath, did he tell you he would get these men's jobs? A. About twice, couldn't be certain; he was so mad I paid no attention; he was roaring around. I never paid any attention how often, but he said two or three times, 'Like to broke my arm,' he said. . . . Q. What was he going to do to these fellows? A. Get their jobs and keep them off Milwaukee property. . . . Q. Did you have a little house to which you invited Mr. Stewart? A. Yes, sir. Q. Did he come in? A. Yes, sir. Q. For what purpose? A. To telephone to Waddell.''

Defendant Stewart testified that, about fifteen or twenty minutes after the altercation with Joslin and York, he telephoned to the M. K. & T. yard office, and explained to Mr. Maddox, the assistant yardmaster of the Missouri, Kansas & Texas Railway Company, what had happened. On the next morning, Stewart reported the occurrence to defendant Anderson, his superior officer, who was the superintendent of defendant, Chicago, Milwaukee & St. Paul Railway Company. On September 27, 1923, defendant Anderson sent the following telegram or letter, addressed to Mr. A. G. Peck, superintendent of the Missouri, Kansas & Texas Railway Company, and to Mr. R. E. Waddell, general yardmaster of the latter company, at Kansas City: ''Yesterday evening at Liberty Street, your fireman, William York, assaulted our general yardmaster, J. P. Stewart. Engineer J. N. Joslin stood by without making any effort to call off this fireman. Also further said to Mr. Stewart that his name was J. L. Sullivan and that he would give Stewart worse than the fireman gave him. From the testimony I have, the assault was unprovoked. This, however, is neither here nor there. The object of this letter is to request you to prohibit these men using our tracks. If they cannot get along with the officials of the Milwaukee we do not want them over here. This means, of course, that they cannot be used on your house job.''

On September 27, 1923, Mr. Waddell, general yardmaster of the Missouri, Kansas & Texas Railway Company at Kansas City, telegraphed his superior officer, Mr. S. B. Moore, division superintendent of the latter railway company, as follows: ''At 5 p. m., September 26th, engineer J. N. Joslin and fireman W. M. York, in charge of M. K. & T. switch engine 24, lining merchandise up at freight house for train 71, either opened blow-off cock on engine, or had engine foaming badly, opposite Milwaukee unloading dock and damaged an automobile that had just been unloaded. General Yardmaster Stewart of the Milwaukee had his attention called to the damage done to the automobile and got up on our engine to interview engine crew as to whether it was our engine that had damaged it; if so, why it was necessary to open blow-off cock or permit engine to foam sufficiently to cause the damage to the commodities on their platform.

General Yardmaster Stewart claims to have gotten on the left side of our engine and walked over to talk the matter over with our engineer, but that he was interrupted by fireman York, although explained to him who he was and what his business was, and that fireman York struck him in the forehead with a monkey wrench, and that when he appealed to the engineer, the engineer told him his name was John L. Sullivan and he would handle him rougher than the fireman did. This engine crew failed to recognize him as a supervising officer of the Milwaukee, although our engine was working on their rails, and on the contrary engaged in a heated argument which resulted in a fight. I have taken engineer Joslin and fireman York out of service pending investigation and notified them to have their representatives ready to conduct a joint investigation Saturday, September 29th. Mr. Anderson, superintendent of the Milwaukee, has written me not to permit either of these gentlemen to come on C., M. & St. P. rails at any point in Kansas City, Mo. As (am?) I justified in taking them out of service for failure to comply with the Milwaukee's representative instructions?''

Plaintiff testified that, upon returning with his engine to the yards of his employer railway company at about six o'clock on the evening of the altercation with defendant Stewart, he was notified by the night yardmaster of his employer that he would be taken out of service at midnight of that day, pending an investigation of the altercation. On the next day, September 27th, plaintiff testified that he was notified by an official of his employer that an investigation would be held on September 29th, at one or one-thirty o'clock in the afternoon of that day.

It appears from the evidence that there was in force and effect, at the time, a written contract or agreement between the Missouri, Kansas & Texas Railway Company, plaintiff's employer, and the Brotherhood of Locomotive Engineers, of which brotherhood plaintiff, Joslin, was apparently a member in good standing. Certain sections or paragraphs of said contract were read in evidence by plaintiff, as follows:

''No engineer will be suspended or discharged, or unfavorable entries made against his record, without just and sufficient cause and without being given an investigation; and in case an engineer is taken off his engine or run, he shall be given a hearing within five days from the time he is taken off. When an engineer is required to attend investigation, he will be given sufficient notice in advance to have the engine man of his choice present, who will be permitted to question all witnesses in his case. Where stenographic notes are taken, engineers will be furnished a copy of all papers.

''When an engineer is brought to trial for any offense, the charges shall be specific, he shall have the right to produce witnesses to testify

in his defense at such investigation and to examine all evidence papers concerning his case, and to question all persons giving evidence in his case, or through his representative.

"An engineer who feels that he has been unjustly dealt with will have the right to appeal to his superior officer through his local or general chairman. If found not guilty, he shall be reinstated and paid for all time lost."

Pursuant to the aforesaid agreement between the Brotherhood of Locomotive Engineers and the Missouri, Kansas & Texas Railway Company, an investigation or hearing was had upon the request, or complaint, made to the Missouri, Kansas & Texas Railway Company officials by defendants, Anderson and Stewart. The hearing was had before Mr. S. B. Moore, division superintendent of the Missouri, Kansas & Texas Railway Company, plaintiff's employer. The hearing was held at the yard office of said company in Kansas City and was commenced on the afternoon of September 29, 1923, and the hearing was continued to, and was concluded on, October 4, 1923. At that hearing, plaintiff Joslin was represented by Mr. O. E. Johnson and Mr. C. J. Knox, who were, respectively, the general chairman and the local chairman of the Brotherhood of Locomotive Engineers, and the fireman York was represented by Mr. Laisure and Mr. Tower, who were, respectively, the general chairman and the local chairman of the Brotherhood of Locomotive Firemen. It appears that defendants, Stewart and Anderson, were present and testified at such hearing, as did also plaintiff, Joslin, and fireman, York, and several other witnesses to the controversy. The testimony (at said hearing) of defendants, Stewart and Anderson, and of the several witnesses other than Joslin and York, is not set out in the record before us. The testimony of Joslin and York at said hearing was put in evidence in the instant cause by plaintiff, and accords substantially with their testimony given in the instant cause.

Upon the conclusion of the investigation and hearing held on October 4, 1923, another and different hearing and investigation was had in Kansas City on October 5, 1923, the day following the conclusion of the first investigation, before Mr. Moore, division superintendent of the Missouri, Kansas & Texas Railway Company. Respecting the reason and purpose of the latter hearing, Mr. Moore, appearing as a witness on behalf of defendants, testified: "Then the following day we gave Mr. Joslin an investigation on the charge of insubordination and for failure to comply with instructions. Q. How did that arise, Mr. Moore? A. He failed to render a special report concerning this irregular or unusual incident that occurred. He was notified of the investigation concerning this incident and did appear at the place at about the hour designated for the hearing and spoke to me at that time, and absented himself without even treating the officers with the

courtesy of excusing himself. Q. This second investigation was on another matter entirely? A. It was on that specific thing or act of insubordination and failing to comply with instructions. Q. Now, who was present on the 5th? A. Why, the investigation was set, to be held with Mr. E. O. Johnson present, C. J. Knox, M. O. Laisure and B. D. Tower, Mr. Waddell and myself and Mr. Joslin with the privilege granted to Mr. Johnson and Mr. Joslin to have any witnesses they might desire appear. Mr. Anderson and Mr. Stewart appeared, and I asked Mr. Anderson why he was there at the investigation, and he told me on request of the men. Q. At any rate, he wasn't there at your request? A. No. Q. That is, at the hearing on the 5th? A. Yes, sir. Q. And this hearing on the 5th, state whether or not it had anything to do with this Milwaukee matter? A. No, sir. Q. And after this investigation on the 5th, then what happened? A. We decided the best for the service was to dismiss Mr. Joslin from the service.''

Plaintiff, Joslin, testified respecting the hearing or investigation of October 5, 1923, as follows: ''Q. You held another investigation on the 5th, what was that for? A. Walking off from this (first) investigation. Q. Refusing to take part in it? A. Yes, sir. Q. Was there a hearing and testimony taken in that case? A. Yes, sir. Q. That was a separate investigation? A. Yes, sir. Q. Now, what became of that investigation? A. Why, we were taken out of the service of the M. K. & T. Q. By reason of that investigation on the 5th? A. Yes, sir. Q. And that was the one where you were being investigated by Mr. Moore as to insubordination to your superior officers? A. Yes, sir.''

On October 6, 1923, Superintendent Moore of the Missouri, Kansas & Texas Railway Company, plaintiff's employer, sent two letters to plaintiff, Joslin, stating therein his conclusions or findings upon the two separate investigations held by Mr. Moore. One of these letters reads: ''Account of the irregularity which occurred at yard engine 24, September 26th, Kansas City, in the vicinity of the M. K. & T. freight house and while using C. M. & St. P. rails, the C. M. & St. P. superintendent has instructed that you be dismissed from service on C. M. & St. P. rails. Under the circumstances as brought out in the investigation, I am forced to sustain his act, and as a consequence you are prevented from performing duties of yard engineer at Kansas City Terminal. However, due to your years of service with this company, I am agreeable insofar as this case is concerned for you to exercise your seniority rights at some other point until such time as you can adjust your record with the C. M. & St. P. railroad.''

The other letter is as follows: ''I regret that I find it necessary to remove you from the service of this company permanently on account of your failure to comply with rules and your act of insubordination in connection therewith.''

On October 10, 1923, Superintendent Moore wrote to defendant Anderson, superintendent of defendant, Chicago, Milwaukee & St. Paul Railway Company, as follows:

"Subject: Case of Engineer J. M. Joslin,
"Fireman W. M. York,
"Irregularity, Yard Engine 24, September 26th.

"Referring to the above-mentioned case: Your objection to these men operating on Milwaukee rails will be sustained and they will not be used."

On December 10, 1923, Superintendent Moore wrote to plaintiff Joslin, as follows:

"This is to advise as per conversation and understanding you are reinstated to your full seniority rights as engineer with the exception you will not be permitted to work at Kansas City Terminal, that is yard service at Glen Park, and it being further understood you will not be compensated for time lost since your dismissal on October 5th."

The evidence tends to show that, after plaintiff had been reinstated to his seniority rights as an engineer by Superintendent Moore of the Missouri, Kansas & Texas Railway Company, as evidenced by the foregoing letter of Moore, dated December 10, 1923, plaintiff made application to his employer for a leave of absence because of illness. Plaintiff testified, "I did this to protect my seniority." On February 23, 1924, plaintiff wrote to Superintendent Moore, his superior officer, stating that he was suffering from an aggravated case of piles, and requested a leave of absence for sixty days, or "until such time as I'm able to work." On March 8, 1924, plaintiff again wrote to Superintendent Moore, enclosing a letter from a physician, certifying that plaintiff was under treatment for epithelioma (cancer) of the nose, and stating that plaintiff must remain at home until cured. Replying to the latter letter, Superintendent Moore wrote to plaintiff on March 11, 1924, refusing a further extension of his leave of absence and stating that "it will be necessary for you to report for duty if you expect to retain your seniority." On April 20, 1924, plaintiff not having reported for duty, Superintendent Moore advised the operating officials of the Missouri, Kansas & Texas Railway Company, and the local chairman of the Brotherhood of Locomotive Engineers, by letter, that "Engineer J. N. Joslin is no longer in the service of this railroad company account of his failure to comply with my instruction of March 11th. Be governed accordingly."

Explaining the order of April 20, 1924, Superintendent Moore testified in the instant suit: "He (Joslin) failed to make proper arrangements to be absent, absent without leave, and after the time limit expired and his local chairman had been called on, we wrote his record off as being no longer in service on account of leaving it."

Plaintiff testified that he had taken an appeal from the final order of dismissal from the service of his employer (of April 20, 1924), under the terms of the agreement between his employer and the Brotherhood of Locomotive Engineers, and that such appeal was pending at the time of the trial of the present suit. He testified further that no appeal had been taken from the two orders of his superintendent made on October 6, 1923, in the matter of the investigation and hearing held respecting the request made by the defendants that plaintiff be not permitted to operate an engine over the rails of the Chicago, Milwaukee & St. Paul Railway Company, and in the matter of the separate investigation of his insubordination to the superior officers of his employer and his failure to make a report to his employer of the altercation with defendant Stewart.

The evidence tends to show that after the investigation and hearing upon the charges, or request, made by Stewart and Anderson, Superintendent Moore offered to place plaintiff upon a road run from Paola, Kansas, so that plaintiff could be at home with his family in Kansas City over Sunday, Moore stating to plaintiff that he would use his influence with the Milwaukee railway officials with a view to having plaintiff restored to the right to use the Milwaukee tracks, which Moore thought might be done in 25 or 30 days, but plaintiff testified that Superintendent Moore's offer was refused by him, on the advice of the Brotherhood general chairman, because the offer was coupled with a demand by Moore that plaintiff must agree to waive his right of appeal from the findings and order of Moore upon the Stewart and Anderson charges under investigation. Plaintiff testified: "I could work any place on the Katy, except in the Kansas City terminals; at outside points; I couldn't work in Kansas City; I could work any place except the Kansas City terminals, because if you are barred off the rails of one company that automatically bars you from operating an engine in those terminals. Q. But you could have taken a road run, your seniority rights are protected every place except there? A. Yes, sir. Q. Now, which is considered the better employment, operating a switch engine or a road engine? A. That depends altogether whether the man prefers one kind of service to the other; some men had rather run an engine on the road, while others in the local yards."

Superintendent Moore testified: "As an operating convenience to the M. K. & T., we don't want an engineer in Kansas City who can not be used on any route on which we might want to use an engineer. Q. That is just a convenience of your own? A. Yes, sir. . . . Q. Then, outside of the inconvenience to you, he could operate on any other track? A. Yes, sir. . . . There's a run in existence on the Kansas City division with the lay-over at Paola, where a junior man is holding the run, which he (Joslin) would be entitled

to; and I suggested to him that he could take that run, which would put him home on Sunday, and it would be a good position, or I thought it would be a good position. Q. Paid as good as the one in Kansas City? A. I don't remember exactly the rate, but I think it is more than the switch engine, especially with the class of engine they use.''

No evidence was offered by defendants, at the trial of the instant action, respecting the controversy or altercation on September 26, 1923, between defendant Stewart, plaintiff, Joslin, and the fireman, York; nor did defendants offer any evidence at the trial bearing upon the truth or falsity of the report of the alercation made by defendants Stewart and Anderson, which resulted in the investigation and hearing by plaintiff's employer on September 29th, and on October 4, 1923. While Stewart testified as a witness on behalf of defendants, he merely testified that he reported, or ''explained,'' the occurrence of the controversy to Mr. Maddox, the assistant yardmaster of the Missouri, Kansas & Texas Railway Company, and to defendant Anderson, Stewart's superior officer. Maddox was not called as a witness by either of the respective parties, plaintiff or defendants, nor was the deposition of Maddox offered in evidence at the trial, and hence the substance of Stewart's report of the altercation of September 26, 1923, to Maddox is not disclosed in the record herein.

At the close of plaintiff's evidence, and again at the close of all the evidence, the defendants requested the trial court to peremptorily instruct the jury that, under the law, the pleadings and the evidence, their verdict must be for the defendants. The peremptory instructions so requested by defendants were refused by the trial court, and the cause was submitted to the jury upon instructions given by the court at the request of the respective parties to the action.

I. At the outset, we are confronted with the contention of respondent (plaintiff) that appellants' brief does not distinctly allege and set out the errors claimed to have been committed by the trial court, as required by Rule 15 of this court, and also that appellants' abstract of the record violates our Rule 13 in that the index to such abstract does not ''specifically identify'' the several exhibits introduced in evidence on the trial of the action. While respondent complains of the aforesaid matters, he does not move for the dismissal of the appeal herein. Nevertheless, if it appears to this court that there is a clear violation of the spirit and purpose of our Rules 13 and 15, we reserve the right and authority to dismiss the appeal of our own motion under our Rule 16, notwithstanding that respondent has not directed our attention to appellants' violation of the rules, or filed a formal motion in this court to dismiss the appeal. [Hutson v. Allen, 236 Mo. 645, 646; Hays v. Foos, 223 Mo. 421, 423.]

While it is true that appellants' brief does not set out, in a distinct and separate subdivision of the brief, a formal assignment of the errors which are claimed to have been committed by the trial court, nevertheless, the brief does point out, clearly and distinctly, the several errors complained of, under the subdivision of the brief entitled "Points and Authorities." An examination of the subdivision of appellant's brief entitled "Points and Authorities," makes clear, and points out to us, the several errors which appellants claim were committed on the trial of the cause and in so doing appellants' brief substantially complies with the spirit and purpose of our Rule 15. We have so ruled the same point in several cases. [Collier v. Lead Co., 208 Mo. 246, 258; Wallace v. Libby, 231 Mo. 341, 344; Ranck v. Wickwire, 255 Mo. 42, 56; Kirkland v. Bixby, 282 Mo. 462, 465.]

Respecting respondent's contention as to the sufficiency of the index to the abstract of record, it appears from the abstract that there were some twenty, or more, documentary exhibits introduced in evidence by the respective parties. These exhibits are respectively identified in the bill of exceptions by the alphabetical letters from "A" to "T," and are likewise respectively identified and referred to in the index to the abstract of record. While this court would have been greatly aided in the examination of the record if the index had identified and referred to each of the separate exhibits by some short and appropriate appellation, denoting the nature of the exhibit (which practice we commend to the bar), instead of by the mere alphabetical letter of identification, nevertheless, we are unwilling to dismiss the appeal merely because the respective exhibits are referred to and identified in the index by the alphabetical letters by which they were identified by the court reporter on the trial of the cause. We do not regard the form and context of the index to the abstract as such a clear violation of the spirit and purpose of our Rule 13 as makes necessary the application of the penalty prescribed by our Rule 16.

II. Appellants (defendants) assign error in the refusal, by the trial court, of the peremptory instructions requested by defendants at the close of plaintiff's evidence, and at the close of all the evidence, which peremptory instructions, if the same had been given, would have directed the jury to return a verdict in favor of defendants. Appellants contend that the refusal of such peremptory instructions by the trial court is reversible error for the reason that there is an entire and total failure of proof of the cause of action stated and alleged in the first count of the petition, upon which count alone the cause was submitted. In other words, appellants insist that the evidence herein furnishes no substantial sup-

port of the substantive allegations of the first count of the petition; wherefore, it was the duty of the trial court to instruct the jury to find for the defendants under the law, the pleadings and the evidence, as requested by defendants.

The gist of plaintiff's cause of action, as alleged in the first count of the petition, is that ''defendants wrongfully and wickedly intending to injure plaintiff and to cause him to be discharged by his said employer, without cause, reason or justification, falsely, wrongfully and maliciously *notified plaintiff's employer . . . demanding the discharge of plaintiff*, and *threatened* said Missouri, Kansas & Texas Railway Company, plaintiff's employer, as aforesaid, *that unless it did at once discharge plaintiff from its service*, the right then and theretofore enjoyed by said Missouri, Kansas & Texas Railway Company . . . of moving its engines and cars over the tracks of the defendant in Kansas City, Missouri, would be denied and prevented, which said right was essential and necessary to the end that said Missouri, Kansas & Texas Railway Company, plaintiff's employer, could do or carry on its business as a public carrier, by reason of which said false statements, wrongful, unlawful and malicious *threats*, acts and conduct of the defendants, and not for any good or sufficient reason, *plaintiff was at the instigation of defendants discharged* and prohibited by his employer from again operating an engine or cars in Kansas City, Missouri.'' (Italics ours.)

We have given scrutinous examination to the record herein, and we do not find therein even a scintilla of evidence that either of the defendants, Anderson or Stewart, or any other employee or official of defendant, Chicago, Milwaukee & St. Paul Railway Company, *requested or demanded the discharge or dismissal of plaintiff* from the service of his employer, or *threatened* plaintiff's employer that, *unless it did at once discharge plaintiff from its service*, plaintiff's employer would be denied and prevented from using the tracks of the defendant railway company. The only positive and direct evidence of the request or demand made of plaintiff's employer by the several defendants, or any of them, is that contained in defendant Anderson's letter of September 27, 1923, addressed to the officials of the Missouri, Kansas & Texas Railway Company, plaintiff's employer, wherein Anderson stated that fireman York had assaulted defendant Stewart and that plaintiff Joslin stood by without making any effort to prevent the assault, and that, from the testimony or information before Anderson, the assault was unprovoked; wherefore, defendant Anderson stated that ''*the object of this letter is to request you to prohibit these men using our tracks. If they cannot get along with the officials of the Milwaukee we do not want them over here. This means, of course, that they cannot be used on your house job.''* Obviously, the aforesaid letter of defendant Anderson does not request or demand

that plaintiff's employer *discharge* or *dismiss* plaintiff from its service; nor does the letter *threaten* plaintiff's employer with a withdrawal or denial of its right to use the tracks of defendant railway company, as theretofore enjoyed, *unless plaintiff be discharged* by his employer. At most, Anderson's letter amounts to a request, and perhaps a demand, that plaintiff and the fireman, York, be prohibited by their employer from using the tracks of the defendant railway company, and states as the reason therefor, "if they cannot get along with the officials of the Milwaukee, we do not want them over here." We find no evidence whatsoever in the record that defendant Stewart asked plaintiff's employer to discharge the plaintiff from its service, or that Stewart, himself, demanded that plaintiff be prohibited by his employer from using the tracks of defendant railway company. There is evidence in the record, as insisted by plaintiff, that defendant Stewart called one Maddox, the assistant yardmaster of plaintiff's employer, upon the telephone about fifteen or twenty minutes after the altercation had occurred between plaintiff Joslin, fireman York, and defendant Stewart, but the record is silent as to what was said by Stewart to Maddox, or that Stewart requested that any action whatever be taken by Maddox, or by plaintiff's employer, in the matter. Defendant Stewart testified that he "telephoned to the M. K. & T. yard office, got hold of the assistant yardmaster Maddox, and *explained to him what had happened.*" Neither the plaintiff, nor the defendants, called Maddox to testify as a witness at the trial; nor was his testimony taken by deposition and read on the trial of the cause. Furthermore, in the examination of Stewart as a witness on behalf of defendants, neither plaintiff nor defendants, asked Stewart to state the substance of the telephone conversation which he had with Maddox, or what Stewart's "explanation" of the altercation to Maddox was. The record before us is equally devoid of any evidence that the defendants, or any of them, made any threat that the right of the Missouri, Kansas & Texas Railway Company, plaintiff's employer, to use the tracks of the defendant railway company would be denied to plaintiff's employer, either in the event that plaintiff and the fireman were not discharged by their employer, or in the event that their employer should refuse defendant Anderson's request that plaintiff and the fireman be prohibited from using the tracks of the defendant railway. It is only by the merest suspicion, surmise, and conjecture that the evidence in the record before us can be said to indicate, in the slightest degree, that defendants (as alleged in the petition) *demanded the discharge* of plaintiff by his employer, or that defendants *threatened* plaintiff's employer that, unless it did *discharge* plaintiff from its service, the right of moving its engines and cars over the tracks of defendant railway company would be denied and prevented. In our opinion, plaintiff has failed to prove, by any

substantial evidence, the substantive. allegations of the petition, constituting his alleged cause of action. This court has heretofore ruled that, where the evidence furnishes no substantial support of the allegations of the petition, then it is the duty of the trial court to instruct the jury to find for the defendant. [Milliken v. Commission Co., 202 Mo. 637, 655; Hyde v. Railway Co., 110 Mo. 272, 280.]

Furthermore, there is no substantial evidence herein that plaintiff was *discharged* by his employer at the *instigation of defendants*, or any of them, as alleged in the petition. In other words, we find no substantial evidence herein that plaintiff was discharged from service by his employer as the direct, immediate and proximate result of the altercation in question, or as the direct, immediate and proximate result of any report of such altercation, or of any request, made by defendants, or any of them, to plaintiff's employer. The evidence shows that plaintiff was given a hearing by his employer upon the matter of the irregularity or misconduct of plaintiff reported by defendants, Stewart and Anderson, to his employer, pursuant to the agreement between his employer and the Brotherhood of Locomotive Engineers. That hearing and investigation was had on September 29 and October 4, 1923, before Mr. Moore, the superintendent of the railway company by whom plaintiff was employed, which officer, according to the evidence, was the official of plaintiff's employer vested with authority, under the agreement between the employer railway company and the Brotherhood, to conduct such hearing and to pass upon the matters therein involved. Plaintiff testified: "Q. Who passes on those investigations, and who passes on the case after it is done? A. Why, the superintendent. Q. That was Mr. Moore? A. Yes, sir." The findings and conclusion of superintendent Moore upon the hearing and investigation so held in response to the complaint or request made by defendants to plaintiff's employer is contained in the letter of Superintendent Moore to plaintiff, dated October 6 1923, as follows: "Account of the irregularity which occurred on yard engine 24, September 26th, Kansas City, . . . while using C. M. & St. P. rails, the C. M. & St. P. superintendent has instructed that you be *dismissed from service on C. M. & St. P. rails.* Under the circumstances as brought out in the investigation, I am forced to sustain his act, and as a consequence you are prevented from performing duties as yard engineer at Kansas City Terminal. However, due to your years of service with this company, *I am agreeable* insofar as this case is concerned *for you to exercise your seniority rights at some other point* until such time as you can adjust your record with the C. M. & St. P. railroad." While the evidence tends to show that the practical effect of barring, or prohibiting, plaintiff from using the tracks of the defendant railway company was to prevent his working as an engineer in the Kansas City terminals, yet plaintiff ad-

mitted, by his own testimony, that he "could work any place on the Katy (M. K. & T. railroad), except in the Kansas City terminals," and that he could have taken a road run and his seniority rights as an engineer would have been protected. There is no evidence in the record respecting the nature and substance of the understanding or agreement, existing at the time of the hearing, between the defendant railway company and plaintiff's employer as to the right of user by plaintiff's employer of the tracks and property of the defendant railway company, or whether such right was terminable wholly at the pleasure of defendant railway company, or whether the defendant railway company had the absolute authority and right to determine for itself what employees of the employer railway company should use the tracks of defendant railway company. But whether or not defendant railway company had the right and authority, under any agreement with plaintiff's employer, to determine for itself what employees of the Missouri, Kansas & Texas Railway Company should use the tracks of defendant railway company, the evidence herein tends to show merely that defendants made a request, or perhaps a demand, to plaintiff's employer that plaintiff be prohibited from using the tracks of defendant railway company, and not any request or demand that plaintiff be *discharged* or dismissed as an engineer from the service of his employer. The evidence further shows that, after an investigation and hearing had been held in the matter of defendants' request, superintendent Moore of the Missouri, Kansas & Texas Railway Company sustained defendants' request and prohibited plaintiff from using the tracks of defendant railway company, but announced that it was agreeable to plaintiff's employer for plaintiff to exercise his seniority rights as an engineer at some other point and place on its railway than the Kansas City terminals. The testimony of the plaintiff, and also the testimony of Superintendent Moore, tends to show that plaintiff was offered by his employer a road run, by which his seniority rights as an engineer would have been protected, but plaintiff, acting upon the advice of the general chairman of the Brotherhood, Mr. Johnson, declined and refused to accept the offer of his employer. There is no evidence that plaintiff's service in the Kansas City terminals was more remunerative than road service; on the other hand, the evidence rather tends to show that road service is the more remunerative service. Plaintiff, when asked which is considered the better employment, operating a switching engine or operating a road engine, replied that "some men had rather run an engine on the road, while others (prefer operating an engine) in the local yards." In short, insofar as the result of the investigation and hearing which was accorded to plaintiff by his employer in response to the report and request of defendants is concerned, the evidence does not, in our opinion, substantiate the sub-

272

stantive allegation of the petition that plaintiff was *"discharged at the instigation of defendants."*

Moreover, the evidence herein shows that, following the termination, on October 4, 1923, of the hearing and investigation held before Superintendent Moore in response to the report or request of defendants, an entirely separate and distinct investigation and hearing was held by Superintendent Moore on October 5, 1923, in which separate investigation plaintiff was charged by his superintendent, Moore, with insubordination to the superior officers of his employer in leaving, or absenting himself from, the prior investigation, and with failure to comply with a rule of the employer company in evidence, which provided: "All employees, especially those in places of trust, are required to report any misconduct or negligence affecting the interest or safety of the railway, and withholding such information will be considered a proof of negligence or indifference, and treated accordingly." Superintendent Moore took the position that said rule required plaintiff to make a written report (upon a form provided for such purpose by the employer railway company) of the altercation which had occurred on September 26, 1923, and plaintiff took the contrary position that the rule, according to his personal understanding and interpretation, did not require him to report the altercation in writing to his employer. The evidence shows that plaintiff appeared in person, and by the Brotherhood representatives, at the second or last investigation, and that Superintendent Moore announced his findings and conclusions upon such investigation in a letter to plaintiff, dated October 6, 1923, wherein he advised plaintiff: "I find it necessary to remove you from the service of this company permanently on account of your failure to comply with rules and your act of insubordination in connection therewith." Notwithstanding the fact that the agreement between the Brotherhood and plaintiff's employer accorded to plaintiff the right of an appeal to his superior officers from the findings and conclusion of Superintendent Moore upon said charge, preferred by Moore, of plaintiff's insubordination to his superior officers and his failure to comply with the rules of his employer, plaintiff admitted, by his own testimony, that he took no appeal to his superior officers from the finding and conclusion of Superintendent Moore upon said charge. Counsel for plaintiff, in their brief and in the oral argument, denominate the charge of insubordination, preferred against plaintiff by Superintendent Moore of the employer railway company, and the investigation and hearing held by Moore on said charge, as a "mere subterfuge," and plaintiff's counsel argue and insist that the charge of insubordination, and the hearing and investigation thereon, were instigated by defendants and were the proximate result of the charges

and demand made to plaintiff's employer by the defendants. We find no evidence in the record that defendants, or any of them, had any part whatsoever in the charge of insubordination made against plaintiff by his superintendent, Moore, or in the investigation held by plaintiff's superintendent respecting such charge, except, perhaps, to appear as witnesses at the latter investigation; and Superintendent Moore testified that defendant Anderson was present at the latter investigation "at the request of the men" (i. e., at the request of plaintiff and the fireman), and not at Moore's request. There is not even a scintilla of evidence in the record that there was any mutual understanding, agreement, connivance, or conspiracy between defendants and the officials of plaintiff's employer respecting the charge of insubordination and the investigation or hearing of plaintiff upon that charge. The positive testimony of Superintendent Moore was that the second hearing, held on October 5, 1923, "had nothing to do with the Milwaukee railway matter," and that, at the conclusion of the second hearing and investigation, "we (plaintiff's employer) decided the best for the service was to dismiss Mr. Joslin (plaintiff) from the service." Plaintiff testified that "he was taken out of the service of the M. K. & T." by reason of the separate and distinct investigation held by Superintendent Moore on October 5, 1923. It therefore appears from the evidence that plaintiff was not discharged as the direct and immediate result of any complaint, report, or demand made by defendants, Anderson and Stewart, or by any other official or employee of the defendant, Chicago, Milwaukee & St. Paul Railway Company, but that plaintiff was discharged and dismissed from service by his employer solely by reason of the separate charge, and as a result of the separate investigation, instigated by Mr. Moore, superintendent of the Missouri, Kansas & Texas Railway Company, plaintiff's employer.

Furthermore, the evidence shows that plaintiff was reinstated by his employer to his full seniority rights as an engineer, on or about December 10, 1923, by written order of Superintendent Moore, with the exception that he was not permitted to work at the Kansas City terminals and upon the understanding that he would not be compensated for time lost since his dismissal by Moore in October, 1923. Thereupon, being advised of his reinstatement with full seniority rights as an engineer by his employer, plaintiff, without returning to work, requested of his employer a leave of absence because of illness, and, before the expiration of such leave of absence, plaintiff requested a further extension of his leave of absence. On March 11, 1924, Superintendent Moore advised plaintiff by letter that his request for an extension of his leave of absence was inconsistent, and notified plaintiff that "it will be necessary for you to report for duty if you expect to retain your seniority." Plaintiff failing to report

for duty in compliance with the written instruction and order of Superintendent Moore, that officer finally dismissed plaintiff from the service of the employer railroad company on April 20, 1924, several weeks after the commencement of his action against the defendants herein. The evidence is positive and conclusive that plaintiff's final and ultimate discharge and dismissal from the service of his employer was occasioned solely by reason of his failure to report for duty under the instructions of his superintendent, Moore, conveyed to him by letter on or about March 11, 1924. Had plaintiff reported for duty pursuant to such instructions, he apparently would have preserved and maintained his seniority rights as an engineer, and, so far as the record before us discloses, plaintiff apparently would have been retained in the service of the Missouri, Kansas & Texas Railway Company.

Under all the evidence in the case, as disclosed by the record herein, plaintiff has failed, in our judgment, to establish that his discharge from the service of his employer was the direct, immediate and proximate result of any charges, report, complaint, or demand made to his employer by the defendants, or any of them. Hence, the evidence furnishes no substantial support of the substantive allegations of the petition, and it was the duty of the trial court, as requested by defendants, to instruct the jury to find for defendants under the law, the pleadings and the evidence.

III. Plaintiff (respondent) makes the point in his brief that the issue of plaintiff's discharge because of acts of insubordination toward the officers of his employer is not raised by the answer of defendants. The answer denies generally the allegations of the petition, which are to the effect that "plaintiff was discharged at the instigation of defendants," and, moreover, the answer denies specifically that defendants, or any of them, "at any time or place caused, or tried to cause, plaintiff to be discharged from the service of his employer, and if plaintiff was discharged, as alleged, by his employer, it was the free and voluntary act of his said employer, wholly independent of any act or acts, or representations of these defendants." We do not see how the issue that plaintiff was discharged solely by reason of the voluntary act of his employer, independently of any acts or representations of the defendants, could have been more squarely and certainly raised than by both the general and specific denials of the answer. The point must be ruled against the respondent.

It is clear to our minds, under the pleadings and the evidence herein, that the trial court should have instructed the jury to return a verdict in favor of all of the defendants, and hence the judgment

*nisi* must be reversed. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.