Benjamin S. Watkins v. Bird-Sykes-Bunker Company, Appellant.
—16 S. W. (2d) 38.

Division Two, April 5, 1929.

*Lowell R. Johnson, Henry M. Shughart* and *Charles M. Miller* for appellant.

Ira B. Burns, Paul T. White and A. J. Stanley for respondent.

HENWOOD, C.—Benjamin S. Watkins, as plaintiff below, obtained a verdict and judgment in the sum of $12,500 for personal injuries suffered by him while employed by defendant as an automobile mechanic and while working under an automobile in defendant's used automobile department in Kansas City, Missouri. The case is here for review on defendant's appeal.

The petition contains numerous specifications of negligence, in connection with the general allegation that defendant failed to furnish plaintiff a reasonably safe place to work and reasonably safe appliances with which to work, but plaintiff submitted his case upon two of these specifications only: first, "defendant negligently failed to furnish blocks or timbers in sufficient number for blocking up said automobile so as to be reasonably safe to work thereunder;" second, "the place where plaintiff was working was dark and with insufficient light for plaintiff to see that the blocks or supports were properly and securely placed under said automobile and on one another or to see when the said automobile or said blocks had slipped or moved from under the wheels of said automobile."

The answer is a general denial, coupled with a special plea that plaintiff's injuries were caused or directly contributed by his own negligence in failing to exercise ordinary care for his own safety.

The reply is in conventional form.

In view of our conclusion that plaintiff failed to make a case for the jury, it will be necessary to consider only the evidence relating to the specifications of negligence above mentioned. With reference thereto, plaintiff's testimony (allowing for some alterations) is stated in his brief as follows:

"Plaintiff, to sustain his case, testified that at the time of receiving his injury, on February 21, 1923, he was thirty-seven years of age, and had been employed by the defendant as an automobile mechanic since July, 1922. He had previously worked for other companies as an automobile mechanic for seven years, and, prior to that time, had been employed as a railroad car carpenter and repairer. He did the general run of automobile mechanical work. Harry McFall was service manager for defendant, and Carl Hallen was his foreman. Defendant was agent for Paige and Jewett automobiles in Kansas City, Missouri, and maintained their sales room and service station equipment at 24th and McGee Streets, and six and one-half blocks away, at 1729-31 McGee, they had a used car branch. The used car branch was housed in a building that faced west, and was composed of a main floor, an upstairs and a basement. The basement ran from the street to the alley and had no outside windows except a coal chute window, which opened into the furnace room on the east end of the basement. There were no windows from the furnace room into the basement. The basement was one hundred and four feet long from the street to the stairway in the rear. In the southeast end of the basement was an elevator shaft, just north of the elevator was a stairway, north of the stairway was a wash rack, and east of the wash rack was the boiler room and coal room. The stairway was boarded up. The day of the accident was the first time plaintiff was ever in the basement. The defendant has no repair shop in the basement. On the day of the accident, he reported for duty at the defendant's place of business, at 24th and McGee, at about eight A. M. Shortly after reporting for work, his foreman told him to go to the used car place to do some electrical work. He got his box of tools, and another employee hauled him up to the used car place at 1729-31 McGee. He had been up there only once before, when he was sent up there to put some light bulbs on the main floor. Defendant had occupied the building at 1729-31 McGee only since about January 1, 1923. When he first got there, he reported to a salesman, Dooley, who referred him to McKinney. McKinney told him to work on a car standing on the main floor; to

take the knock out of the motor. He first objected because he was told to do electrical work. McKinney told him to 'do it or else.' He understood this to mean to do it or be discharged. The car was a Paige five-passenger touring car. He then asked McKinney where to do the work, and McKinney told another employee, Peterson, to take the car to the basement and get the stuff to work with. Peterson was employed as a mechanic at the used car place. Peterson put the car on the elevator and took it to the basement, and he walked down the stairway, getting there first, with his tool box of wrenches, spanners, chisel, etc. Peterson edged the car around and headed it against the north wall, four to six feet from the wall and at the west edge of the wash rack. The basement was filled with used cars except a small place where Peterson placed the car in question. While Peterson was placing the car, he looked around for jacks, hoists or something to raise the car. Peterson told him of a jack underneath another car, and he got it. There was only one light in the basement. It was about fifteen feet east of the car, and of fifty or sixty candle-power. There were no bulbs in any other light socket. He looked for other lights and found none. He asked Peterson for blocks, to block the car with. While Peterson was getting them, he drained the oil from the car. Peterson threw down an armload of blocks and said that was all they had, and then left, and he didn't see Peterson any more that day. He had his drop cord light with him. The drop cord light had a fifty or sixty candle-power bulb on it, with wire cage around it. He hooked this cord up with an empty socket in the ceiling at the place indicated by Peterson. There was no natural light in the basement. He examined the blocks brought by Peterson and found them to be six so-called 4 x 4 (actual measurement 3′ x 3′ or 3½′ x 3½′) twelve to fourteen inches long. There was a pile of scrap lumber, box lumber piled against the wall and he could find nothing to use in it. He then went upstairs and asked for a phone, but they had none. McKinney was gone. He then went back to the basement and put the jack under the front end of the car and jacked it up equivalent to the space of two blocks. Then he put two blocks, one on top of the other lengthwise. under each of the front wheels and then lowered the car onto the blocks. He then took the two remaining blocks and put one in front of and the other to the rear of the right rear wheel, and also set the emergency brake before jacking the car up. The brake worked all right. When he first came, McKinney asked him to have the car ready for demonstration after noon. He arrived about 8:30 A. M. He diagnosed the knock as due to loose bearings. To take up the bearings, the oil had to be drained. He took down the crank case, so as to get to the bearings underneath. He took off half of the loose

bearings, and took out the shims, in order to make the bearings fit. The bearings are connected to the crank shaft. It was a six-cylinder car. After jacking up the car, he took down the crank case. To do this, he had to get under the car. It took about ten minutes to take off this crank case. He then started to work on the bearings, starting on the front bearing. He was lying more on his side. He had worked about one and a half hours before he was hurt. He had taken up two or three bearings. In doing the work and after taking up a bearing, he would get out from underneath, go around to the front, take the crank and crank the car over, to see how tight he had that bearing and turn the next bearing over where he could get to it. Each time he took his service light and examined the blocks underneath the wheel. While he was working, he had his extension light underneath the car where he was working. Dirt fell off the bottom of the car into his face, and, this time, he turned over on his back to work the dirt off his face, and, as he turned over he saw the car move toward the east and it struck his hand. The eastward movement was slight. It struck the palm of his hand and drove his elbow into the concrete floor and bore his hand over his stomach, and a block from under the right front wheel flew out and hit him a glancing blow on the head. He then crawled out and called for help. As he worked under the car, he could see the position of the blocks by taking his extension lamp in his hand and holding it toward the block he was examining. The approximate length of the whole basement was one hundred thirty feet and about thirty-three feet wide. The floor was concrete. In a distance of eight feet east of the car, the floor sloped to the east two and one-half inches. In the main shop, defendant had some 6 x 6 blocks, used for blocking up cars. The one light fifteen feet from the car was the only light in the basement. After placing the blocks under the front wheel, he loosened the jack enough to allow the weight of the car to rest on the blocks. There is a vibration on the tires while working on them. There was no other place in the basement where he could work.

"Cross-Examination.

"There was a stairway leading from the main floor to the basement. His first visit to the used car place was immediately after defendant moved into 1729-31 McGee. His tool box contained wrenches, service cord, hammer, chisels, punches. He went down the stairway into the basement where he was hurt. He got down before Peterson did, with the car on the elevator. Peterson set the car in the basement. He set his tool box down and looked around to see where he was going to work. He stood beside the car while Peterson placed it. He asked Peterson about the jack. He searched for ma-

terial to block the car with by using such light as he had. He never went back into the dark end of the basement. There were no bulbs in the light sockets around where he was working. He couldn't see in the other portion of the basement. His drop cord was about twenty feet long. He couldn't find any other light bulbs in the basement. He didn't know of any switch box at the foot of the basement stairs. It is an ordinary incident to have to block up cars to work under them. To work on bearings, you had to go under the car. He used such material in blocking up the car as was furnished. He got the jack and asked Peterson for blocks. The jack was operated by a crank in front of the car. On one end of the jack was a long handle. It was operated by worm gear. The jack was three-cornered, with a wheel on each corner. Peterson brought the blocks to him. Peterson then left, and he did not see him again. It was only customary to block one rear wheel when the emergency brake was applied. He went upstairs after Peterson left to call his foreman, Mr. Hallen, to see if he wanted him to work on that job with that number of blocks and in the place the car was put. He looked no further for blocks. They had no telephone. He was supposed to hurry on the job. He didn't think he was putting himself in immediate danger by living up to the orders that he had been given. He felt reasonably safe. Defendant had a service truck in the main shop that they used to run errands and carry material and supplies. When the equipment was given him and the orders given to get the car out, he knew he had to get to work, and, using his best judgment and the equipment furnished, he thought he could work this particular job without raising any trouble. At the time he was hurt, he didn't know whether he had taken up two or three bearings. There were six connecting rods and three main bearings to be taken up. He had worked about an hour or an hour and a half when he was hurt. If he had thought that his arm would have been injured, he wouldn't have worked on the car for any man. With the care he exercised, he thought he was safe. The car was placed in the only available place in the basement and the only light was fifteen feet away. He never tried to take the car out of the basement. There were crowded conditions in the main shop at 24th & McGee. He had been told that they had no room for used cars at the main shop. The only move he made of the car, after Peterson had placed it, was by turning it with the steering wheel. When he got underneath the car, he understood the importance of the car not moving off the blocks. In the basement west of where he was working, the basement was full of cars. When he jacked the car up, he applied the bearing on the jack to the front axel, so that, after he had lowered the jack, the weight would be resting on the blocks and not on the jack. You can't pull the car with the jack

under it, you have to have some other force or power to help move the car about, because the jack would pull out. He couldn't leave the weight of the car on the jack, because the jack had wheels and would roll and is not used to take up bearings. You can't keep the weight of the car on the jack and the blocks at the same time. You had to depend upon either the blocks or the jack. He had left the jack with the top bearings just resting on the axles or touching the axle. It didn't support the weight of the car. He had improvised a paper reflector for his service light, which was a piece of paper slipped inside of the guard. The lumber in the basement was just scrap lumber, and contained no blocks. The lumber varied in length. He didn't think it was necessary to block both rear wheels when the emergency brake was applied. The lumber was from two to six inches wide and an inch thick. The bearings were fastened to the bearings or crank shaft by means of nuts and bolts. In taking out the bearings, he had to loosen the nuts, and some of them were real tight. He didn't think he put his whole strength on them. He pulled all directions, toward him and away from him. He did not put his foot against the axle. If he wanted to change his position, he reached up and took hold of the car and raised himself from the floor and swung around. He was lying on an old rug, with his head pointing north and his feet toward the southeast. A service lamp was right by his head on the right side. He couldn't hang the lamp on some part of the car, because the light reflects in your face, and he put it on the floor, so it couldn't shine into his eyes. Every time he crawled out from under the car to crank the car or see how tight he had a bearing, he took his service light and examined the blocks to see if the car was sitting on the blocks. He last did this about ten or fifteen minutes before he was hurt. During the last ten or fifteen minutes, he was working on the bearings, and his light was lying by his side. Any time he thought he had used any excess strength, he examined the blocks. This was the first time he had ever jacked up a car on 4 by 4's of this particular kind, and he thought it would require watching. When one rear wheel of a car is blocked and the other rear wheel is not blocked, the blocked rear wheel will have a tendency to act as a pivot and the car will swing around, if enough power is applied on the side of the unlocked rear wheel. He worked on both sides of the car. in taking off the nuts with a wrench, but he did this underneath and in the center of the car.

"Re-Direct Examination.

"He didn't see anyone around there to whom he could complain regarding the blocks and lights. The porter, McGrew, came downstairs once. The emergency brake apparently held."

The only other evidence offered by plaintiff, on the issue of defendant's negligence, is found in the deposition of Ralph H. Peterson, which was taken by defendant. The deposition of this witness is fairly stated, in substance, in defendant's brief. Such statement (with some alterations) is as follows:

"Plaintiff read the deposition of Ralph H. Peterson in his part of the case, which deposition had been taken by defendant. Peterson then resided in California. Peterson testified that he was a mechanic at the used car department, and put in all of his time there. Because he was busy on another job, plaintiff was called from the service station at 24th & McGee. The equipment at the used car department, for doing mechanical work on automobiles, consisted of wrenches and other tools, a three-wheeled Weaver jack and two or three smaller jacks. There was a bunch of blocks in the basement, off from the cars, on the north side of the wall. There were four or five of these blocks, and they were 4 x 4 or 4 x 6. They had blocks of the same kind upstairs, on the main floor. The Weaver jack could be used for holding the car up. McKinney was the manager at the used car department, but each mechanic handled the jacks and blocks according to his best knowledge. When additional equipment was needed, it was the practice of the mechanics to take cars to the main service shop or to go there and get such equipment and take it to the used car department. At the place he had left the car in the basement, it was perfectly level and there was plenty of light for a man to work in the basement. The lighting conditions were suitable for doing mechanical work, and an extension or drop service light was sufficient for working underneath an automobile. He thinks he took the Paige car down in the basement the evening before the accident. He left the car in the basement a few feet west of the wash rack, with the front of the car headed in a northeasterly direction. After seeing plaintiff that morning, he went away to do some work. He had never had any trouble working in the basement on account of the insufficiency of lights. He was gone about an hour or more, and, when he returned, he went down into the basement and looked at the automobile and saw that it was in the same position as he had left it, only it was down off the blocks. 'It appeared that the car rolled back off the blocks some way.' The blocks were in front of the car. There were also extra blocks upstairs, if plaintiff needed any more. Plaintiff had never made any complaint to him about the blocks. The next day he finished taking up the bearings on this Paige car. The Weaver jack could have been left under the front axle as an extra precaution against the car dropping to the floor when the wheels dislodged themselves from the blocks. Plaintiff, afterwards, in relating to him as to how the accident occurred, said: 'I was taking up one of the main

bearings and the car rolled back when I was pulling on the main bearings.' ''

The evidence offered by defendant is contradictory to plaintiff's testimony on every matter of vital importance. It will serve no purpose, therefore, to state it in detail. In substance, it tends to show that the basement of defendant's used car department was well equipped with lighting facilities, having from ten to sixteen 60-watt drop lights, several of which were near the wash rack and the place where plaintiff was working when he was injured; that there was a large number of blocks, of various dimensions in the basement, and that there were blocks of the same kind on the main floor and upstairs floor of the building; that all of its mechanics were instructed to take cars from its used car department to its main service station, or to come there or telephone there, whenever they needed additional materials, tools or appliances in repairing cars, and that such was the custom and practice of its mechanics.

Other facts and circumstances will be noted in the further discussion of the evidence.

I. According to the evidence most favorable to plaintiff, he was ordered by his foreman (Hallen), at defendant's main service station, to go to the used car department "to do some electrical work." Upon reaching there, he was ordered by the manager of that department (McKinney) "to take the knock out of the motor" of the automobile in question. McKinney told plaintiff's fellow-servant (Peterson) "to take the car to the basement and get plaintiff the stuff to work with." Peterson placed the car in the basement, "threw down" six 4 x 4 blocks about twelve to fourteen inches long, "and said that was all they had." There was only one light in the basement. This light was "of fifty or sixty candle-power" and fifteen feet east of the car. There were no bulbs in the other light sockets. He looked for other lights and found none. There was no natural light in the basement. He attached his drop-cord service light, "of fifty or sixty candle-power," to an empty socket in the ceiling "at the place indicated by Peterson." While Peterson was getting the blocks, he drained the oil from the car. "Peterson told him of a jack underneath another car," and he got it. First setting the emergency brake on the car, he placed the two prongs of the jack under the front axle of the car and jacked up the front end of the car sufficiently to enable him to place two blocks under each front wheel, lengthwise, and one on top of the other. He released the prongs of the jack from the axle, but left the jack in its original position under the front end of the car. He used the other two blocks by placing one immediately in front of and one immediately behind the right rear wheel. He then took down the crank

case, and, upon examination, "diagnosed the knock" (in the motor) "as due to loose bearings." In taking down the crank case, and in working on the bearings, it was necessary for him to get under the car. After he had been on the job about an hour and a half, and while tightening up the second or third bearing (there being six in all), "he saw the car move toward the east" and fall off of the blocks which he had placed under the front wheels. Some part of the car, underneath, struck "the palm of his hand and drove his elbow into the concrete floor and bore his hand over his stomach, and a block from under the right front wheel flew out and hit him a glancing blow on the head." The car in so falling caused the injuries of which he complains.

(a) Conceding, as plaintiff says, that one light, fifteen feet east of the car, and his service light, were the only available lights for his use in doing the work in question, nevertheless it appears that, by the aid of these two lights, he was able to jack up the front end of the car, block up the front wheels, block the right rear wheel, take down the crank case, "diagnose" the trouble in the motor, and complete his work on two or three of the six bearings, before the front wheels fell off the blocks and thereby injured him. In addition to such light as was furnished by the one drop-ceiling light, fifteen feet east of the car, the 60-watt service light, with a cord twenty feet long, was available for plaintiff's use at any point underneath or along the outside of the car. It was intended for this very purpose, and he admits that he so used it. He says that he thought the blocks under the front wheels "would require watching," and that "he took his service light and examined the blocks to see if the car was sitting on the blocks, every time he crawled out from under the car to crank the car or to see how tight he had a bearing; any time he thought he had used any excess strength, he examined the blocks; he did this last about ten or fifteen minutes before he was hurt; during the last ten or fifteen minutes, he was working on bearings, screwing and unscrewing them, and his service light was lying by his side." In the face of such testimony from the plaintiff himself, was it for the jury to say whether or not defendant negligently failed to furnish plaintiff with sufficient light to see that the blocks were properly and securely placed under the wheels of the automobile or to see when the blocks were slipping from under the wheels of the automobile? We think not. It being admitted that the service light was available for plaintiff's use at all times, and that he actually used it in blocking up the front wheels of the automobile and in watching the condition of the blocks during the progress of the work, it follows that the failure of defendant to furnish more drop-ceiling lights was not the proximate cause of his in-

juries, and that no recovery therefor can be predicated upon defendant's negligence, if it was negligent, in this particular. [Koch v. United Rys. Co. (Mo. App.), 258 S. W. 37.]

(b)  It seems equally clear that there is no causal connection between plaintiff's injuries and the charge that "defendant negligently failed to furnish blocks or timbers in sufficient number for blocking up said automobile so as to be reasonably safe to work thereunder." True, plaintiff testified that Peterson "threw down" six 4 x 4 blocks about twelve to fourteen inches long, "and said that was all they had." But, conceding that Peterson made such a statement (though, in his deposition read in evidence by plaintiff, he denies it), and conceding, for the sake of the argument only, that plaintiff had a right to act upon Peterson's statement without further search or request for additional blocks, the evidence fails to show, either directly or inferentially, that plaintiff would have used any additional blocks, even though there had been an unlimited supply nearby and available for his use. On the contrary, plaintiff's own testimony indicates that he would not have used any more blocks, if there had been more blocks within his reach. He says that "it was only customary to block one rear wheel when the emergency brake was applied," and that he "set the emergency brake before jacking the car up," and that "the brake worked all right." When asked, upon cross-examination, why he did not block the left rear wheel with some of the blocks or pieces of lumber, which he saw nearby in the pile of scrap-lumber, he said: "Don't think it was necessary with the emergency brake, and the one I had blocked." Upon further cross-examination, he said that, with one rear wheel blocked and the emergency brake set, "he felt reasonably safe." Confronted with this testimony, the jury could do no more than speculate as to whether plaintiff would have used more blocks, if more blocks had been available, and as to how or in what way he would have used them. Juries are not permitted to exercise their imagination in reaching verdicts. Verdicts must be based upon substantial evidence, and not upon speculation and conjecture. [Hamilton v. Ry. Co. (Mo. Sup.), 300 S. W. 787.]

(c)  There is another reason why plaintiff cannot recover in this case. Although he was ordered "to take the knock out of the motor" of the automobile, he was not directed by anyone as to how the work should be done. He was a skilled automobile mechanic, with a general experience of more than seven years in that kind of work, and knew as much, at least, about a reasonably safe method of doing the work, as Hallen, his foreman, or McKinney, the manager of the used car department. Nor was he bound, under the orders given him by Hallen and McKinney, to do the work in a way and under conditions that were not reasonably

safe, by reason of insufficient light or an insufficient number of blocks. It appears that plaintiff was fully aware of his rights along this line, because he says "he went upstairs, after Peterson left, to call his foreman, Mr. Hallen, to see if he wanted him to work on that job with that number of blocks and in the place the car was put." In this connection, he also says "defendant had a service truck in the main shop that they used to run errands and carry materials and supplies." Unfortunately for plaintiff, he did not carry out this intention of getting in touch with his foreman and of requesting more lights and more blocks, if they were needed to make the work reasonably safe, but, when he learned that "they had no telephone" at the used car department, went ahead and took his chances on doing the work under the conditions as they existed, whatever those conditions may have been, and chose his own method of doing the work. Under such circumstances, the defendant is not liable, regardless of what may have caused the front wheels of the car to fall or slip off of the blocks and the resulting injuries to plaintiff.

The applicable rule is well stated by Judge LAMM as follows: "Under modern conditions, the master may carry on a business over a vast field with thousands of employees in different branches of labor, widely separated, and his servants may never come under his actual eye. In this condition of things, looking at the matter from the master down to the servant, it has been said that the master may not delegate (and thus avoid) his primary duties in furnishing his servants a safe place and suitable and safe material and appliances, by merely giving general orders and directions, however wholesome and full, to others, who are foremen, i. e., vice-principals. And such is the law. But, on the other hand, the law entertains another view, from another standpoint—a view that, beginning with the servant and considering him, looks up to the master. By this view, we start with the postulate that a servant is presumed to possess, not only common sense, but certain knowledge peculiar to his trade, or art. The master may be presumed to hire, not only the bodily services of the servant (his hands, eyes, ears, muscles and legs), but the skill and knowledge pertaining to the servant's art or trade and possessed by the latter. Hence, it is steadily held as sound law that the master may trust the servant to perform the intermediate, the ordinary and simple duties incident to the servant's employment and resting upon the servant's knowledge and skill." [Forbes v. Dunnavant, 198 Mo. l. c. 209, 95 S. W. l. c. 938.]

In discussing this rule, Judge Cox says: "Along with the duty of the employer to use ordinary care for the safety of his employees goes the duty of the employee to use ordinary care for his own safety. He cannot, under all circumstances, blindly rely on the master and pay no attention to his own safety, but must use his own faculties

and his own knowledge of the facts in taking care of himself. The master has the right to rely upon the servant to do that thing, and that fact must be kept in mind in determining whether or not the master has discharged his duty toward the servant.'' [Watson v. Lime Co. (Mo. App.), 290 S. W. l. c. 651. See, also, Knorpp v. Wagner, 195 Mo. 637, 93 S. W. 961; Kellerman v. Telephone Co., 189 Mo. App. 506, 176 S. W. 1059; Chandler v. Lead Co. (Mo. App.), 178 S. W. 217; Kube v. Mining Co. (Mo. App.), 209 S. W. 614; Clark v. Wheelock (Mo. App.), 293 S. W. 456.]

With special reference to the issue of insufficient light, see Railroad v. Andrews, 171 Ala. 200; Beard v. Hubinger Bros. Co. (Ia.), 141 N. W. 418; Boucher v. Paper Co. (Me.), 96 Atl. 833.

It follows, from what has been said, that the trial court should have given defendant's instruction in the nature of a general demurrer at the close of all of the evidence in the case.

II. Having reached this conclusion, it becomes unnecessary to consider the other appellate issues, relating to given and refused instructions and the size of the verdict.

We are not unmindful of the seriousness of plaintiff's injuries, nor of the heavy loss he must bear as the result of his injuries, but it is our duty to determine all cases in accordance with the law as it is written. For the reasons hereinabove stated, the judgment should be reversed. It is so ordered. *Davis, C.,* concurs; *Cooley, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.