PETER J. CARPENTER v. WABASH RAILWAY COMPANY, Appellant.—71 S. W. (2d) 1071.

Division Two, May 17, 1934.

*Homer Hall* and *Woodward & Evans* for appellant.

*Eagleton, Henwood & Waechter* for respondent.

WESTHUES, C.—This is an appeal from a judgment in respondent's favor and against appellant in the sum of $15,000. Respondent's suit was based on the Federal Employers' Liability Act, for damages due to personal injuries.

Appellant introduced no evidence. Respondent's evidence reveals the following: Respondent was a member of a working crew engaged in unloading steel rails from a railroad car along the main line track of appellant west of St. Charles, Missouri. Respondent and a man

named Zalueke were stationed on the car. Respondent on the east and Zalueke on the west end, each equipped with a lining bar. It was their duty to place the rails in proper position to be lifted from the car by means of an air-hoist. The ball of the rail was required to be up so that the tongs of the air-hoist could be attached thereto. The rails also had to be free from the balance of the rails on the car. While respondent and Zalueke were engaged in placing a rail in its proper position for the air-hoist, respondent lost his balance and fell off the car, a distance of eight feet to the ground. Respondent continued his work that day and the next, but was unable to work thereafter because he developed a severe pain in his back. Details of the injuries will be stated under the point disposing of the question of the excessiveness of the verdict.

Appellant's sole contention for reversal of the judgment is that respondent failed to adduce sufficient evidence to sustain a verdict in his favor, particularly, that the evidence failed to show any negligence on the part of appellant. Appellant contends that liability in a case of this nature must be predicated on negligence. This requires no citation of authority. Appellant also points out in its brief that:

"Verdicts must be based upon substantial evidence, and cannot be sustained by a mere scintilla of proof. Speculation and conjecture cannot form the basis of recovery." (Citing cases.)

"Inasmuch as this case is controlled by the Federal Employers' Liability Act, the sufficiency of the evidence to support a recovery must be tested by the principles found in the decisions of the Federal courts." (Citing cases.)

There is no need for stressing the fact that the Federal decisions control upon this point since it is well-settled law in Missouri that a verdict of a jury cannot stand unless based on substantial evidence. The Missouri rule is in harmony with the Federal rule. Note what this court said in Warner v. St. Louis & M. Railroad Co., 178 Mo. 125, 77 S. W. 67, l. c. 69.

"The burden of proof is primarily upon a plaintiff to prove the negligence charged. It is not enough to show an accident and an injury. A causal connection must be established between the accident and the negligence charged in order to make out a case for the jury. Failing in this, as this plaintiff did, the court should take the case from the jury, because, if it was submitted to the jury, and if a verdict was returned for the plaintiff, it could not stand, for the reason that it would have no foundation in law or in fact to rest upon. [Holman v. Railroad, 62 Mo. 562; Sorenson v. Paper Co., 56 Wis. 338, 14 N. W. 446.] In other words, the mere concurrence of negligence and injury does not make the defendant liable. There must be a direct connection between the negligent act and the injury, and the negligence must be the proximate cause of the injury."

In a recent case, Watkins v. Bird-Sykes Bunker Co., 322 Mo. 830, 16 S. W. (2d) 38, 1. c. 43 (2, 3) this court ruled: "Verdicts must be based upon substantial evidence, and not upon speculation and conjecture." The respondent to sustain a verdict was, therefore, required to prove negligence and that the negligence was the proximate cause of his injuries.

██ Respondent testified in part as follows:

"Q. Tell what happened on that occasion? A. I had my end of the rail broke open and I hollered to him to hold. We were holding— I was holding the end up and so was he, just a little while, but he yanked the rail and threw me—over-balanced me, and I went over on the north side of the car.

"Q. In what position were you standing, with reference to directions there—which way were you facing? A. I was facing west. I had just turned my head west.

"Q. But the front part of your body— A. I was at kind of an angle.

"Q. You were looking at Zalueke? A. Yes, sir; at the west end of the car.

"Q. What you have just told, you saw him doing that? A. Yes, sir.

"Q. You were prying the rail to the south? A. Yes, sir.

"Q. How were you pulling the bar? A. Back toward me to the north.

"Q. Back toward you to the north? A. Yes, sir.

"Q. Were your two feet together, or did you have one foot in front of the other? A. No, sir; I had my left foot on top of the heel rail. Both rails were in front of me, one north and one south. I had my foot over the rail. . . .

"Q. After you hollered to Zalueke to hold it, did he say anything to you then before he yanked the rail? A. No, sir.

"Q. What happened to the rail when it was yanked? A. It went south.

"Q. What became of the rail when Zalueke yanked it, did it move any? A. Yes, sir; it went south.

"Q. It went south? A. Yes, sir.

"Q. What effect did that have on you? A. It threw me loose from the bar, and I went over.

"Q. Were you thrown down underneath? A. Yes, sir; where the rail was laying; they were all piled in.

"Q. Were there other rails underneath this rail, pried out? A. Yes, sir.

"Q. There were other rails beneath this? A. Yes, sir.

"Q. This rail wasn't on the bottom of the car? A. No, sir."

On cross-examination he testified:

"Q. Neither you nor George Zalueke had any control over each other? A. No, sir.

"Q. You were both laborers, removing those rails? A. Yes, sir.

"Q. Now, to move this rail out, you put your bar in between that rail and another rail; is that right? A. Yes, sir.

"Q. And that other rail that you lift up is what you refer to as a 'heel?' A. Yes, sir.

"Q. You insert your bar down between these rails? A. Yes, sir.

"Q. Had you moved your rail out any? A. Yes, sir.

"Q. How far? A. I had my end of the rail out.

"Q. Your end was out? A. Yes, sir.

"Q. The other end was not out? A. Yes, sir; he had his end out just a little while out after, when I called him.

"Q. But you got your end out first? A. I had my bar in between the rails; I was pulling against the bar, and we had it out far enough.

"Q. Your end was out, but the other end was not out? A. Yes, sir; both ends were out.

"Q. Both ends were out? A. Yes, sir."

Arthur Welch, a member of the working crew, testified that he was standing on the ground at the west end of the car near Zalueke and at the opposite end from where plaintiff was at the time of the accident. He testified as follows as to what occurred at the time:

"Q. Did you say anything? A. I heard him holler and I hollered to Zalueke to hold it.

"Q. You hollered to Zalueke to hold it? A. Yes, sir.

"Q. Then what happened? A. I seen Pete go off the car backwards.

"Q. You saw Pete go off the car backwards? A. Yes, sir.

"Q. By 'Pete,' you mean Peter J. Carpenter, the plaintiff in this case? A. Yes, sir.

"Q. Were you looking at Zalueke when you hollered to him to hold it? A. Yes, sir.

"Q. Did you see him do anything? A. He threw the rail south.

"Q. How did he throw the rail south? A. Got the bar and raised it over.

"Q. You mean by pushing down on the bar?

"Mr. Woodward: Just a moment. Don't lead the witness.

"The Court: Yes.

"Mr. Reardon (Q.): What do you mean by that? I want to get definitely from you what you saw Zalueke do after you hollered 'Hold it?' A. Zalueke moved the rail south.

"Q. Did Zalueke have a lining bar? A. Yes, sir.

"Q. In what way or what manner did Zalueke move his bar to cause the rail to move south, that you observed? A. He moved the rail south.

"Q. How did he manipulate his lining bar? A. I didn't pay that much attention. I know the rail moved south.

"Q. Did you hear Zalueke say anything to Carpenter after Carpenter hollered and you hollered 'Hold it' to him and before he moved the rail south? A. No.

"Q. You didn't hear him holler anything? A. No.

"Mr. Woodward (Q.): What was your answer?

"Mr. Reardon: His answer was 'No.'

"Mr. Reardon (Q): Can you estimate the time that elapsed, if any, between the time that Carpenter hollered, 'Hold it' and you hollered 'Hold it' to him, that he moved the rail? A. Well, I haven't the least idea.

"Q. You don't know? A. No, sir.

"Q. Was there any lapse of time? A. Oh, yes."

On cross-examination he testified as follows:

"Q. Here is Carpenter down here at this end, pulling down here (indicating); let's go to where Zalueke was; at the time you heard Carpenter yell 'Hold it,' what was Zalueke doing? A. He was trying to get the rail out.

"Q. He was trying to get the rail out? A. Yes, sir.

"Q. And he was prying on it? A. Yes, sir.

"Q. His end was not loose? A. No, sir; not exactly loose.

"Q. His end was still engaged with the other rail? A. It wasn't perfectly tight.

"Q. He had not gotten it loose? A. It was loose enough to move it.

"Q. At the time Carpenter yelled, 'Hold it,' and Zalueke was working at it, had it gotten out far enough for the tongs to get hold of it? A. No, sir.

"Q. Exactly. Then, both of these men were supposed to move both ends of the rail until they got out far enough for the tongs to get hold of it? A. Yes, sir.

"Q. Then Carpenter yells 'Hold it,' but Zalueke's end is not out far enough for the tongs to get hold; that is right? A. Yes, sir.

"Q. And Zalueke moved his farther out for the tongs to get at it? A. Yes, sir.

"Q. And when Zalueke moved his end out south, in order for the tongs to get a hold, that is when Carpenter fell? A. Yes, sir.

"Q. And that is the way this accident happened? A. Yes, sir."

It is apparent from the evidence quoted that a jury would be authorized to find that respondent and also Welch called to Zalueke to "hold it," meaning the rail, in time for Zalueke to have acted thereon and not have moved the rail. While the evidence was short it was nevertheless positive proof of a fact. Such evidence constituted more than a scintilla of proof. In Hardy-Burlingham Mining Co. v. Baker,

10 Fed. (2d) 277, the Circuit Court of Appeals, Sixth Circuit, in considering the questions of "scintilla" and "substantial evidence" quoted with approval the following:

"A scintilla of evidence, or a mere surmise that there may have been negligence on the part of the defendants, clearly would not justify the judge in leaving the case to the jury. There must be evidence upon which they might reasonably and properly conclude that there was negligence. . . . Applying the maxim, *'De minimis non curat lex,'* when we say that there is no evidence to go to the jury we do not mean that there is literally none, but that there is none which ought reasonably to satisfy a jury that the fact to be proved is established."

This was also approved in Koonse v. Mo. Pac. Ry. Co., 322 Mo. 813, 18 S. W. (2d) 467, l. c. 470 (6).

The questions in the case are: Was the act of Zalueke in moving the rail, after he had been admonished to "hold it," negligence and was such act the proximate cause of respondent's injuries?

Appellant states its position in the argument as follows:

"Obviously, one engaged in loading or unloading operations of articles which must be moved or thrown as a result of what is sometimes called 'synchronization' necessarily assumes a risk as a matter of law of the failure of the human mechanism to synchronize on every move. This is so well recognized that it calls for no citation of authorities. In order to attempt to gain the desired end of synchronization negroes of the South have probably reached as near the ultimate goal as is possible by conforming their movements to the cadence of the so-called 'work songs.' Even there, however, you find a man unconsciously ahead of or behind the cadence. He bears down on his bar a little bit heavier this time than he did the last or bears down a little bit sooner than he did the last. This is inherent in the work itself, no matter how simple the work. The work here was the simplest form of manual labor and plaintiff clearly assumed the risk of this error."

That argument may be sound, but it does not apply to the facts in this case. The task of plaintiff and his fellow workmen may have been very simple, but it was also very dangerous if not performed in a careful manner. Respondent, of course, assumed the risks incident to his employment. If respondent had not called to his fellow worker to "hold it" and the cause of respondent's fall had been due to a premature movement of the rail because his fellow worker was accidentally out of step or out of time in his movement of the rail, the argument of appellant might apply. But in this case instead of Zalueke being merely out of time he was notified not to move the rail. If for any reason he was unable so to do would he not, under the circumstances, have owed the duty to his fellow worker to warn him to

that effect? This was one of the questions submitted to the jury. The instruction of the court, submitting the case to the jury, insofar as it is pertinent to this issue, reads as follows:

"The Court instructs the jury that if you find and believe from the evidence that on the occasion in question . . . plaintiff and another employee of the defendant were engaged in moving rails from one of the defendant's cars there, and that while thus engaged, if you do so find, plaintiff became and was in a position of imminent peril of being unbalanced and injured in the event the particular rail mentioned in evidence was moved, if you so find, and that the said other employee, in the exercise of ordinary care, could have seen plaintiff in said position of imminent peril, if you so find; and if you further find that, notwithstanding the aforesaid circumstances, if you do so find, said other employee did prematurely move said rail, if you do so find, without warning the plaintiff of his intention so to do, if you do so find, and that as a direct result thereof plaintiff was thrown from said car and injured thereby; and if you further find that in thus prematurely moving said rail under the circumstances aforesaid, if you do so find, without giving plaintiff a warning, if you do so find, said other employee was then and there guilty of negligence, and that the plaintiff was injured as a direct result of said negligence on the part of said other employee, then your verdict will be in favor of the plaintiff and against the defendant herein."

We are of the opinion the instruction fairly submitted the issues to the jury. It was a jury question of whether Zalueke's act of moving the rail without warning was negligence, after he had been notified to "hold it." It was also a proper question for the jury to determine whether Zalueke, under the circumstances, should have discovered that respondent was in peril. The rail in question was one of many rails remaining on the car. The unloading of these rails, as said before, was attended by a degree of danger to the laborers. The jury could have well found that the act of moving the rail, under the circumstances as they existed, constituted negligence; also, that respondent's call to Zalueke to "hold it" was notice to Zalueke that respondent was in a position of peril. It was in evidence and appellant lays much stress upon the fact, that such a call was very unusual and unnecessary in the ordinary course of performing the task respondent and Zalueke were engaged in. That such a call was unusual we think strengthens the position that the fellow worker should have known respondent was in danger. We hold the evidence sufficient to support the verdict of the jury.

Appellant insists that the verdict of $15,000 was grossly excessive. The evidence of medical experts shows that respondent's coccyx, commonly known as the tail bone, was fractured and dislocated. There was also evidence that an existing arthritic condition in the fourth and fifth lumbar vertebra had increased since the in-

138

jury. Plaintiff testified that prior to his injury he was an able-bodied man capable of performing hard labor. He was engaged in such labor at the time of his injury. Plaintiff testified that he had never had any trouble with his back prior to the accident.

Doctors testified that due to respondent's injuries he had been unable to work since the accident and that he would continue to suffer pain on account of the fracture of the coccyx and the arthritic condition. To get a better understanding of plaintiff's arthritic condition we desire to quote excerpts from the evidence of the medical experts. Dr. J. A. Jenkins testified as follows:

"Q. When you first saw him, what was his condition and what did you find him suffering from, and thereafter tell us if you rendered any treatment and what the nature of the treatment was. A. He came to my office, complaining of stiffness and pain on motion, and, in fact, at that time he had constant pain in his back, more severe on motion. Upon examination, I simply was able to elicit tenderness over his lumbar region of his back and running down about the middle of his back, the first lumbar vertebra, down over the sacrum and the lower portion of his spine. All his lumbar muscles were rigid and showed that he was unable to move without a great deal of pain. I ordered a belt for him to fix the limit of motion in his back, as much as possible, and began to give him some treatment, simply what we call radium treatment, and I gave him that together with fixation of this belt, up to the present time. . . .

"Q. Tell us what arthritis is? A. It is an inflammation of a joint.

"Q. It is an inflammation of a joint? A. Yes, sir.

"Q. What does arthritis commonly cause? A. You mean what changes does it produce?

"Q. In the bony structures? A. A proliferation of bone around there, especially in the spine; you get what is called a 'lipping' in the spine. That is a proliferation or outgrowth of bone and the interspaces become hard or calcified in a good many instances, or at least cartilaginous, or harder than usual. Therefore, there is a certain limitation of motion in arthritis."

Dr. Joseph Peden testified as follows:

"A. I think you could only speculate on what the future might hold. He may get worse or better. It is difficult to say. . . . .

"Q. Assuming that his pain has not desisted at all and his treatment is the same as two years ago, given that history, what is the likelihood of an increase in the future? A. I think, Mr. Reardon, you would have to speculate.

"Q. You don't know? A. No, sir.

"Q. You doctors do know that, once that condition is present, it cannot be decreased by any form of treatment we know now? A. The anatomical condition that exists, that is a structural condition and will not decrease.

"Q. The bony deposits, those spurs you find between those vertebrae, that condition will not decrease? A. The spurs will not absorb; no, sir.

"Q. They are part of the bone itself? A. Yes, sir.

"Q. It is new bone formation? A. Yes, sir.

"Q. Once created it cannot be decreased? A. No, sir.

"Q. So, in so far as that bony deposit as now existing and as shown in the X-ray pictures taken February 2, 1931, that is a permanent condition? A. Yes, sir. The things shown on the X-ray are permanent.

"Q. Arthritis comes, of course, from many things? A. Yes, sir.

"Q. What are the causes of arthritis? A. Arthritis is usually classified as infection; infectious diseases or traumatic, due to injury.

"Q. Where you find an arthritic condition is more or less mobilized in one particular point, what is your opinion as to the cause of it? A. We think it is traumatic; however, that does not necessarily follow. It may be traumatic, due to injury, or a multiplicity of injuries—that is, many shocks that the spine may receive throughout life.

"Q. Would you indicate on yourself where the fourth and fifth lumbar vertebrae are located in the back? A. Just above the large hip bone (indicating)."

It was conceded, by respondent's witnesses, that he had arthritis prior to his injuries. It may be fairly inferred from the evidence that this condition was aggravated by the injury. The fracture of the coccyx was of course entirely due to the fall.

The injuries respondent received in this case were to a great extent similar to those sustained by the plaintiff in Zichler v. St. Louis Public Service Co., 332 Mo. 902, 59 S. W. (2d) 654, 1. c. 659 (18). A careful comparison of the two cases leads us to the conclusion that the judgment in this case should not be in excess of the amount authorized in the Zichler case. There a judgment of $15,000 was reduced to $10,000.

If, therefore, respondent will within ten days enter a *remittitur* of $5,000 the judgment of the trial court will be affirmed for $10,000, as of the date of the original judgment. Otherwise, the case will be reversed and remanded. It is so ordered. *Cooley* and *Fitzsimmons*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. *Leedy* and *Tipton, JJ.*, concur; *Ellison, P. J.*, absent.