TRANSAMERICAN FREIGHT LINES, INC., A CORPORATION, RESPONDENT, v. MARCROME ART MARBLE COMPANY, A CORPORATION, APPELLANT. —150 S. W. (2d) 547.

St. Louis Court of Appeals.    Opinion filed May 6, 1941.

Petition for Writ of Certiorari denied by Supreme Court July 25, 1941.

*Elmer O. Jones, Mat J. Holland, Robert N. Jones* and *Phillip Rashbaum* for appellant.

*Holland & Holland* of counsel.

*Igoe, Carroll, Keefe & McAfee* and *Victor A. Wallace* for respondent.

McCULLEN, J.—This suit was brought by respondent, as plaintiff, to recover from appellant, as defendant, a balance alleged to be due for freight charges for a series of shipments of building materials. A trial before the court and a jury resulted in a directed verdict in favor of plaintiff in the sum of $875.54 on plaintiff's cause of action and in favor of plaintiff on defendant's counterclaim. After an unavailing motion for a new trial defendant appealed.

The petition of plaintiff alleged that it is engaged in interstate and intrastate transportation of property for hire by means of motor vehicle; that, on February 1, 1937, defendant entered into a contract with plaintiff for a series of shipments of building materials over plaintiff's lines, to be carried from defendant's factory in St. Louis consigned to the Universal Supply Company, Resettlement· Administration, Greenhills Project, Cincinnati, Ohio; that by said contract defendant was to furnish all labor and material for packing, storing and unloading said materials in plaintiff's semi-trailers, and to unpack and unload the same on arrival at destination; that defendant guaranteed payment of the freight charges; that, according to the weights and tariffs published by plaintiff under the rules of the Interstate Commerce Commission, the amount due plaintiff for freight charges was $1046.87; that defendant had paid thereon $171.33, but refused to pay the balance of $875.54, for which amount plaintiff prayed judgment.

Defendant answering admitted that it had entered into a. contract for a series of shipments of building materials wherein it was shipper and plaintiff· the carrier. It also admitted that said materials were to be transported to the place and consignee alleged in plaintiff's petition, and denied each and every other allegation of plaintiff's petition.

For counterclaim, defendant alleged that plaintiff was a common carrier of goods, wares. and merchandise; that defendant was engaged in the business of manufacturing and selling a product known as art marble, a. building material; that, during November, 1936, defendant agreed with plaintiff that plaintiff would transport a series of shipments of said building materials to Universal Supply Company, Greenhills Resettlement Administration Project site, Cincinnati, Ohio; that said shipments, all in sound condition and properly prepared for hauling, were accepted by plaintiff, as a common carrier for hire, for transportation at intervals during a period from December, 1936, to March, 1937.

Defendant further alleged in its counterclaim that on certain dates, specifically set forth therein, certain articles of building materials, also set forth and specifically described, were received from plaintiff

at their destination damaged and destroyed beyond condition of usefulness because of cracking, chipping and splitting; that said damage occurred while said property was under the custody and control of plaintiff, and that the value thereof was $787.02; that, because of the destruction of said materials, it became necessary for defendant to adjust the loss in time and materials and to manufacture materials in substitution for those destroyed; that defendant bore postponement of receipt of the purchase price of said destroyed materials to its damage and loss in the additional sum of $130.80. Defendant prayed judgment on its counterclaim for the total sum of $917.82, with interest.

For reply plaintiff alleged that defendant was to load, pack and place the materials in plaintiff's trucks; that all breakage and damage which occurred was directly caused by negligent packing of said materials by defendant; that the claimed breakage and damage occurred during a rainy period of about fifteen days at the project site, and was directly caused by defendant towing plaintiff's equipment by means of a tractor across muddy fields at said site. Plaintiff denied that defendant suffered damage by having to adjust said breakage or by having the purchase price of said materials withheld.

As to defendant's first assignment of error that the verdict is against the weight of the evidence, it is sufficient to say that an appellate court is not authorized to pass upon the weight of the evidence in a law case. [Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079; Dickes v. Bookman (Mo. App.), 6 S. W. (2d) 981.]

At the trial it was conceded by defendant that there was no dispute as to the correctness of the amount of the freight charges alleged by plaintiff and plaintiff's evidence on this point was not controverted. Furthermore, it was admitted by defendant that plaintiff did perform the services of carrier under the contract alleged. Therefore, in view of the theory upon which the case was tried by the parties and the court, the question for us to determine is whether there was any substantial evidence entitling defendant to have its counterclaim submitted to the jury.

Defendant's second and third assignments of error are that the court erred in directing a verdict for plaintiff at the close of the whole case, and in refusing to submit defendant's counterclaim to the jury, as well as in directing a verdict for plaintiff thereon. Apparently recognizing that its assignments of error are all directed to one general contention, defendant, in its brief, has confined its points and authorities and argument to the action of the trial court in dealing with the counterclaim.

William F. Maier, department manager and salesman for defendant, who also had been assistant to the manager of the defendant, testified that he recalled the sale by defendant of building materials to the Universal Supply Company to be used on a housing project near Cincinnati, Ohio. He described the materials as a concrete

product, and testified that defendant arranged with plaintiff to transport the goods. In this connection the witness testified:

"Q. Do you know whether the plaintiff hauled all of the goods sold under that sale? A. No, they did not.

"Q. Who were the other carriers? A. Well, a few loads in the beginning was hauled by our own truck, and then in the latter part of the job, after there was some controversy arose, we changed truck lines."

The witness further testified that the first shipments probably moved in December, 1936 or 1937; he didn't recall the exact year; that the loading of the material was supervised by defendant's shop foreman together with plaintiff's truckman. As to the damage to the materials, the witness testified:

"A. Well, I didn't see any of the damage personally myself.

"Q. What would you know in that connection? A. The only thing I know is through correspondence from the job site that pieces arrived in damaged condition."

During the examination of this witness a lengthy discussion arose between counsel for the parties and the court concerning the admissibility of correspondence and certain papers called pink slips and white slips purporting to show rejections by the United States Government of the materials in some of the shipments. The evidence shows that the United States Government was interested in the housing project near Cincinnati. The witness identified and in his testimony referred to a statement written by himself in which the amount of the damaged goods was figured up and was given to defendant's stenographer for billing. Referring to the statement prepared by him based upon the rejection slips heretofore mentioned, Mr. Maier testified:

"Q. (By Mr. Jones, counsel for defendant) Now, can you give me the total quantities of each kind of block that was rejected for being damaged? A. Well, I can give you that, yes, as we numbered the pieces or identified them; we gave them marks. We have here mark 'No. 1,' 321 lineal feet, and those marks were subdivided into 1 A, B, C and D, and also No. 1 here was 101 pieces; 2B was 17 pieces; No. 6A was 41 feet, 11 inches of material. Those numbers I read are numbers that identify our material for setting purposes at the job.

"Q. Will you state what the total value of each type of rejected material is? A. Well, in some cases the way the job was figured, some of the material was figured by the lineal foot and other characters of material was figured by the piece.

"Q. So that in the first type you gave me—what was it? A. 321 lineal feet at $1.01 a foot.

"Q. What would be the total value? A. $324.63.

"Q. Can you give me the value of the others? A. 101 pieces at

$4.13; total of $417.13. 17 pieces at 69c, $11.73. 41 feet, 11 inches at 80c, $33.53. Or a total of $787.02.''

The abstract of the record shows that a group of sheets of paper was marked by the court reporter as defendant's Exhibit No. 1, and was offered and received in evidence, and although the abstract of the record contains the following: ''(Here insert Defendant's Exhibit 1),'' said exhibit does not appear anywhere in the abstract. Said exhibit was referred to by counsel and the witness as follows:

''Q. I will hand you Defendant's Exhibit 1 and ask you to read the top and all the letters—you can omit these figures—all of this receipt to down to about here. A. (Reading) 'Receiving and inspection Report 6697. Procurement Office.'

''Q. Just a minute. I didn't mean for you to eliminate the dates; include the dates. A. 'Released November 24, 1936. Procurement Officer, U. S. Treasury Department, Green Hills, Ohio, Purchase Order RA 100688. Official Project 56-86. Allotment No. 35.' And then up here it says 'Received,' and opposite that: 'Date of Rejection After Inspection: February 18, 1937. To: Job Site, Green Hills, Ohio. February 10, 1937. From: Universal Supply Company, Washington, D. C.,' which is listed as the vendor or vendor's agent.

''Q. I will ask you to give the date from this that the material arrived at Green Hills, at the Green Hills project, and also the date that this rejection after inspection was made? A. How may I determine when it was shipped?

''Q. Here it says, 'received at job site, Green Hills, Ohio.' A. Thats right.

''Q. February 10th? A. That's right.

''Q. 'Date of rejection after inspection: February 18th.' Is that correct? A. That is what it says.''

At this point in the testimony of the witness, counsel for plaintiff objected ''to all this, Your Honor. It shows this has nothing to do—this is a piece of paper between the consignee and the Universal Supply Company and the Government.'' This was followed by discussion between counsel for the parties and the court, during which the court, addressing counsel for defendant, said: ''That has to be connected up, hasn't it, Mr. Jones, at some stage of this proceeding?'' After further discussion between the court and counsel for the parties, without any direct ruling by the court on plaintiff's objection, counsel for defendant introduced a slip of paper in witness Maier's handwriting, which was marked and referred to as defendant's Exhibit 2. Concerning this exhibit, the abstract of the record shows: ''Said defendant's Exhibit 2 so offered and received in evidence is in words and figures as follows, to-wit: (here insert Defendant's Exhibit 2).'' The exhibit does not appear in the abstract as called for.

Clifford Chappie testified, on behalf of defendant, that in 1936 or 1937 he was driving for defendant; that he made delivery of building blocks or materials to a place called Green Hills Resettlement near

Cincinnati, Ohio; that the truck he used belonged to defendant. The witness testified further:

"Q. (By Mr. Jones) After you got there, in what condition was the job site? A. I only pulled on the job once. The rest of the time I was pulled in with a tractor.

"Q. Who furnished the tractor? A. I imagine it belonged to the Government.

"Q. Under what conditions was this tractor furnished? A. Well, as soon as we would get stuck or pulled in as far as we could, he would say, 'Stay there; we will go and get the tractor.' I don't know whose tractor it was.

"Q. Did you ever have any complaints about broken materials? A. No, not to me."

On cross-examination the witness testified:

"Q. You say you took one load to this Green Hills project? A. No, I took, I guess, between twelve and fifteen loads.

"Q. About what time of the year? Can you fix an approximate date? A. It was the latter part of November when I took the first one.

"Q. November of what year? A. 1936, I think."

The only other testimony bearing on the question to be determined in this case was given in the deposition of a witness named Mr. Blanford, an engineer in the employ of the United States Government, who testified as follows:

"Q. And how was the unloading done? A. Well, used timber skidways from the tail end of the truck and rollers to let the pieces of stone down, and they were placed on what we call skid timbers to support them upon solid ground so they would be easily accessible.

"Q. Did you make an inspection of the materials before they were unloaded on the job? A. When the first truck was being unloaded, one of the inspectors in my department called me at my office and asked me to come down and look at the material because of its damaged condition. When I arrived there at the site the truck was partly unloaded, a few pieces had been unloaded and I inspected myself the pieces which had been unloaded and also the balance of the pieces which were in the truck.

"Q. What was the condition of the materials you found? A. They were in a large measure, in fact, a high percentage of them had chipped edges on their finished edges, that is the edges which had to show. The pieces which were broken were to be utilized for curbs around porches and they had to show and submit a finished corner, and those corners had been damaged."

Fred H. Woerner testified, on behalf of defendant, that he was production manager of defendant in 1937; described how the various materials for shipment to the Green Hills Resettlement Administration near Cincinnati, Ohio, were packed in the customary manner. He stated he knew of his own knowledge that the plaintiff hauled some but not all of the shipments; that there were no complaints about

the goods arriving in damaged condition "until we got a whole bunch at one time." The witness testified:

"Q. Are you in a position to know whether the breaking that was complained of occurred on the hauls made by plaintiff or by the other truckers who hauled? A. Well, from my reports there, it was Transamerican."

On cross-examination the witness testified:

"Q. Did you see the reports of the damage? A. These red slips or pink slips we had here yesterday?

"Q. Those pink slips are what you saw? A. Yes; that was my first knowledge of it.

"Q. You said there were several other trucking companies that handled these loads? A. Our own truck at the start."

We have set forth at length every bit of evidence in the record that can be said to bear on the real issues in the case, and find that it does not measure up to the requirement of the law to make a case for the determination of the jury on defendant's counterclaim. While there is much hearsay testimony, also conclusions of witnesses, as well as loose discussion, there is no substantial competent evidence whatsoever to prove the charges made by the defendant in its counterclaim.

Defendant's counterclaim described with particularity the various kinds of goods and the specific dates on which they "were received from plaintiff at their destination damaged and destroyed beyond condition of usefulness because of cracking, chipping and splitting;" and "that said damage occurred while said property was under the custody and control of plaintiff." The burden therefore rested upon defendant, among other things, to adduce substantial evidence showing that the goods so described were received in a damaged condition at the times alleged to entitle it to have its counterclaim submitted to the jury. The counterclaim of defendant, insofar as defendant's right to have the jury pass upon it is concerned, is governed by the same rule as a plaintiff's petition in that respect, and it is the established rule that, where the evidence furnishes no substantial support of the allegations of a plaintiff's petition, it is the duty of the court to direct the jury to find for the defendant. So, in this case, defendant's counterclaim not being supported by any substantial evidence, the trial court correctly gave a peremptory instruction to the jury to find for plaintiff. [Joslin v. Chicago, M. & St. P. Ry. Co., 319 Mo. 250, 270, 3 S. W. (2d) 352, 362; Strauss v. The American Chewing Gum Co., 134 Mo. App. 110, 114 S. W. 73.]

Defendant did not sustain the burden that rested upon it by. adducing evidence merely showing that "some goods" were delivered in a damaged condition "at some time" during the period of all the deliveries by "some one." The "scintilla of evidence" rule, by which a party is entitled to have his cause submitted to the jury for determination if he presents any evidence, however slight, in support

thereof, does not prevail in this State. We are governed in that respect by what is termed the "substantial evidence" rule. This is shown by the uniform rulings of our courts. [Joslin v. Chicago, M. & St. P. Ry. Co., *supra*; Wallingford v. Terminal R. R. Ass'n., 337 Mo. 1147, 88 S. W. (2d) 361; Strauss v. American Chewing Gum Co., *supra*.] Juries are not permitted to exercise their imagination in reaching their verdicts. Verdicts must be based upon substantial evidence and not upon speculation and conjecture. [Watkins v. Bird-Sykes Bunker Co., 322 Mo. 830, 840, 16 S. W. (2d) 38, 43.]

It will be recalled that Mr. Maier, defendant's own witness, testified that plaintiff did not do all of the hauling of the goods that were shipped "under that sale." He stated that "a few loads in the beginning were hauled by our own truck." Furthermore, defendant's own driver Chappie testified that he delivered, in defendant's own truck, "between twelve and fifteen loads" to the housing site project mentioned. It is obvious, therefore, that a number of loads of materials, "between twelve and fifteen loads," at the beginning of the deliveries were not hauled or delivered by plaintiff, and it will be recalled that Mr. Blanford, United States Government engineer, who was the only witness to give testimony of his own knowledge concerning damaged goods, testified in his deposition that he inspected "the first truck." We are left entirely to speculation and conjecture as to whether the "first truck" was defendant's own truck driven by its own driver Chappie, or was one of plaintiff's trucks driven by an employee of plaintiff. Mr. Blanford's testimony shows that he inspected "the pieces which had been unloaded and also the balance of the pieces which were in the truck;" and while Mr. Blanford testified that "a high percentage of them had chipped edges on their finished edges," there is no evidence to show, either in Blanford's testimony or any other evidence, whether the chipped materials were those which had been unloaded and were at the time of his inspection on the ground, or those which remained in the truck.

The record shows that the court allowed defendant the utmost latitude to enable it to present evidence to connect the hauling and delivering of materials done by plaintiff with the goods that were found to be damaged. This was evidenced by the court's admonition to counsel for defendant "That has to be connected, hasn't it, Mr. Jones, at some stage of this proceeding?" Nevertheless, a search of the record fails to disclose any evidence to establish such connection. There is no evidence whatsoever to show, or from which it could be reasonably inferred, that the materials inspected by witness Blanford when the "first truck" was unloaded were the materials which were hauled and delivered by plaintiff. Any reasonable inference from such evidence as there is would be that those damaged goods were delivered by defendant in its own truck. Defendant simply failed to make a *prima-facie* case on its counterclaim. While defendant did introduce substantial evidence showing that it delivered materials to

plaintiff in good condition to be carried by plaintiff as a common carrier to the point of destination, there was a total failure of proof to show that the goods which were found to be damaged as charged in the counterclaim were the goods delivered by plaintiff.

In Gilpin v. Mo. K. & T. Ry. Co., 197 Mo. 319, 325, 94 S. W. 869, 871, our Supreme Court quoted with approval from Smith v. Burrus, 106 Mo. 94, 100, 16 S. W. 881, 13 L. R. A. 59, 27 Am. St. Rep. 329, as follows: *"Prima-facie* evidence of a fact is such evidence as in the judgment of the law is sufficient to establish the fact, and if not rebutted remains sufficient for the purpose." In the Gilpin case, *supra*, the court further said:

"But a *prima-facie* case must be complete in itself. If it depends on an inference to be drawn, the facts shown in evidence must be sufficiently explanatory of themselves to justify the inference; if the evidence goes no further than to show a condition from which the defendant might or might not be judged to be in fault, as further developments might show, and the plaintiff leaves the subject at that point, he has not made out his case; if from the case made the inference the plaintiff seeks to draw cannot be drawn without further facts or explanation he is not entitled to throw on the defendant the burden of proving that the undisclosed facts are such as forbid the inference the plaintiff seeks to draw." [Gilpin v. Mo., K. & T. Ry. Co., 197 Mo. 319, 325, 326, 94 S. W. 869, 871.]

Defendant argues that, inasmuch as plaintiff introduced no evidence to rebut the evidence adduced by defendant in support of its counterclaim, it was error for the court to refuse to submit the counterclaim to the jury. The answer to such argument is that plaintiff was not required to introduce evidence in rebuttal because defendant failed to make a *prima-facie* case on its counterclaim. It did not present any substantial evidence in support thereof. When defendant had finished presenting such evidence as it did present, and it did not measure up to the requirement of the law with respect to a *prima-facie* case, then, under the established rule concerning "substantial evidence," heretofore referred to, it was the duty of the court to declare as a matter of law that defendant was not entitled to recover on the counterclaim.

A consideration of the entire record leads inescapably to the conclusion that the trial court did not err in refusing to submit defendant's counterclaim to the jury, and committed no error in directing a verdict for plaintiff.

The judgment is accordingly affirmed. *Anderson, J.*, concurs; *Hughes, P. J.*, not sitting.